32 U.S. 627
 7 Pet. 627
 8 L.Ed. 808
 Ex parte JUAN MADRAZZO.
 January Term, 1833
 
 1
 Mr. White presented a libel, in the admiralty, against the state of Georgia, claiming relief, by the aid of this court, in favor of the libellant, a subject of his Catholic majesty the king of Spain, domiciled in the city of Havana.
 
 
 2
 The right of the libellant to maintain this proceeding against the state of Georgia Mr. White stated, depended on the construction the court would give to the eleventh amendment of the constitution of the United States, which declares, that 'the judicial power of the United States shall not be construed to extend to any suit in law or in equity, commenced or prosecuted against one of the United States by citizens of another state; or by citizens or subjects of any foreign state.' If the court should be of opinion that, notwithstanding this amendment, jurisdiction could be entertained in a suit in the admiralty against a state, he asked that a citation in the nature of admiralty process, or such other proceedings in the case, as the court should deem proper, should be awarded against the state of Georgia, returnable to the next term of this court.
 
 
 3
 The libel stated, that the libellant, Juan Madrazzo, was a subject of the king of Spain; that about the 2d of July 1817, a vessel called the Isabelita, owned by him, with all the documents on board to show her ownership and character, cleared out from the city of Havana, for the coast of Africa, with a cargo of merchandise, his property, to trade there, exclusively on Spanish account, for a cargo of slaves, to be conveyed to the said city, there to be disposed of for his sole account, property and risk. On the coast of Africa, the vessel took on board, purchased with the said merchandise, one hundred and twelve slaves, and on her return-voyage towards Havana, about the first of October 1817, she was captured by a piratical or insurgent cruiser, under the commission of one Aury, or some other revolutionary flag of the revolted colonies of Spain, not then recognised as an independent government, nor in any manner authorized to act as a belligerent power, by the laws or consent of nations. The capturing vessel was called the Successor, commanded by one Moore, an American citizen, and was fitted out at Baltimore, and in the river Severn, in the state of Maryland, for the purpose of carrying on hostilities against the property and subjects of the king of Spain, with whom the United States then were and still are at peace; wherefore, the said capture of the vessel was illegal, piratical and felonious.
 
 
 4
 The Isabelita and her cargo were carried by the Successor into the port of Fernandina, in the island of Amelia, at that time a colony of Spain, but usurped by the pretended patriots or revolutionists affecting the rights of sovereignty, and a separate station as a revolted independent government, but in truth composed of a band of adventurers, chiefly American citizens, united principally by the hope of plunder, and not acknowledged as an independent government for any civil or national purpose. There, the Isabelita and her cargo were condemned as lawful prize to the illegally commissioned piratical vessel, the Successor, by a tribunal pretending to exercise admiralty jurisdiction, under the usurped and assumed government of the place.
 
 
 5
 The vessel was afterwards restored to the libellant by a decree of the district court of the United States for the district of South Carolina, exercising jurisdiction as a court of admiralty, upon a libel filed for restitution on behalf of the libellant; the proceedings in that case were invoked and referred to. The slaves, the cargo of the Isabelita, were sold under the illegal decree pronounced at Fernandina, and by one William Bowen, the purchaser, were conveyed to the Creek nation, where, at a place called 'the United States Agency,' within the limits of the said nation, they were, to the number of ninety-five, seized and taken possession of by an officer of the United States, and brought within the limits and district of Georgia. These ninety-five slaves were subsequently delivered over to the government of the state of Georgia, on pretence that they had been illegally imported or introduced into the United States, contrary to an act of congress, and in compliance with an act of the assembly of the state of Georgia to carry the same into effect. A part of the slaves were sold by the government of Georgia, or its officers or agents, without any form of trial or judgment, as directed by the said act of assembly; and the proceeds thereof, to the amount of $40,000, paid into the treasury of the state of Georgia. The residue of the slaves, twenty-seven or thirty in number, remained in the possession of the state or its officers, or had been converted to or disposed of by the state, for its own use; or wrongfully delivered to some persons not entitled to the same, and contrary to the will of the libellant. The slaves, or the proceeds of those sold, could not rightfully become the property of the state of Georgia, by virtue of the piractical capture, seizure or cendemnation, or by the unlawful acts of the pretended purchaser of the same; but the same remained the property of the libellant.
 
 
 6
 The libel further stated, that the governor of the state of Georgia, on the 20th of May 1820, on the pretence that the said negroes had been illegally transported to the Creek nation, and unlawfully imported into the United States from some foreign place, with intent to hold them to service and labor, filed a libel in the district court of the United States for the district of Georgia, alleging the unlawful importation, and that a demand of them had been made by the society for the colonization of free people of color in Africa; which the governor alleged he was desirous of complying with, if authorized to do so by a decree of the court. No specification was made of the number of the slaves, and no mention was made of the illegal seizure and sale of the slaves, in the information, or of the payment of the $40,000 into the treasury of the state of Georgia.
 
 
 7
 The libel further stated, that William Bowen, who had purchased the slaves, the cargo of the Isabelita, put in a claim for the whole of the said slaves, on the 7th November 1820; alleging that they were his property, and were not intended to be introduced into the United States, but had been carried into the Creek nation for safety, with the intention to remove them to West Florida, a colony of Spain; the truth of which allegation the libellant admitted. The libellant, hearing of the proceedings in the district court of Georgia, filed a libel claiming the slaves; and the district court dismissed the claim of William Bowen and of the libellant, and decreed in favor of the governor of Georgia. That decree, on appeal to the circuit court of the United States was reversed; the claims of the state of Georgia and of William Bowen were dismissed; and that court decreed that the said slaves should be restored to the libellant, Juan Madrazzo, together with the proceeds of them, sold and paid into the treasury of the state of Georgia. From this decree, the governor of Georgia, on behalf of the state, appealed to this court.
 
 
 8
 From the district court of the United States of Georgia, a warrant of arrest, upon the libel of this libellant was issued; but the execution being prevented or evaded by the government and officers of the state of Georgia, the same was never served. A monition was also issued, and served on the governor and treasurer of the state of Georgia.
 
 
 9
 The libel proceeded to state the proceedings in the circuit court of the sixth circuit, in which it was ordered, that it should be held a sufficient execution of the warrant, if the governor of Georgia should sign an acknowledgment that the slaves were held by him, subject to the jurisdiction of the court; upon which, on the 15th of May 1823, John Clark, the governor of Georgia, signed a paper, filed in the court on the 24th December 1823, by which he acknowledged, that the governor of Georgia held the negroes levied on by virtue of sundry executions by the sheriff of Baldwin county, 'subject to the order of the circuit court of the United States for the district of Georgia, after the claim of the said sheriff, or prior thereto, if the claim in the circuit court shall be adjudged to have priority of the proceeding in the state court.'
 
 
 10
 The libel stated, that the executions referred to had been levied on the slaves, as the property of William Bowen and the proceedings in the case showed that the same did not belong to him. That the libellant relied on the stipulation entered into by the governor of Georgia, by which the jurisdiction of the circuit court of the United States was admitted; and he proceeded to prosecute his appeal in the circuit court, in which no exception to its jurisdiction in the case was suggested or moved. In the circuit court, the rights of the libellant were established; the illegal outfit of the Successor was fully proved; and every other matter shown, to entitle him, as a Spanish subject, to the restitution of his plundered property. From the decree of the circuit court, appeals were entered to the supreme court of the United States.
 
 
 11
 The libel then stated the proceedings in the cases in the supreme court, of January term 1828, as the same are reported in 1 Pet. 110, &c., and complained that the jurisdiction of the supreme court, in the case, was denied by the governor of Georgia, on behalf of the state, in direct violation of the stipulation entered into by him, consenting to, and acknowledging the said jurisdiction; by which the said court were prevented proceeding to give a decree or judgment in the case. That by reason of the proceedings aforesaid, and of other acts of the state of Georgia, her officers and agents, which the libel alleged to have been tortious, and by the sale and dispersion of the slaves, the libellant was prevented seizing or identifying his property; he was without remedy or redress, unless this court will cause the state of Georgia to do him right in the premises.
 
 
 12
 Wherefore, the libellant prayed the court to award admiralty process against the state of Georgia, to be issued and served as the court might direct, citing the said state of Georgia, as well as all others concerned, to show cause why the proceeds of the said slaves, paid into the treasury of the said state, should not be paid over to the libellant; the slaves remaining in the possession of the state restored to him; a just and reasonable compensation decreed to him for the slaves, converted to her own use, or otherwise taken by the state; and such other damages allowed to him, as the owner of the slaves, as the court might think proper, against the state of Georgia, &c.
 
 
 13
 MARSHALL, Ch. J., delivered the opinion of the court.
 
 
 14
 This is not a case where the property is in custody of a court of admiralty, or brought within its jurisdiction, and in the possession of any private person; it is not, therefore, one for the exercise of that jurisdiction. It is mere personal suit against a state, to recover proceeds in its possession, and in such a case, no private person has a right to commence an original suit in this court against a state.