**Frederick P. ADAMS, Plaintiff,**

**v.**

**HARRIS COUNTY, TEXAS, Defendant.**

**Civ. A. No. 69–H–215.**

United States District Court,
S. D. Texas,
Houston Division.

July 30, 1970.

---

**64.** United States v. Morgan, 346 U.S. 502, 511, 74 S.Ct. 247, 252, 98 L.Ed. 248 (1954).

W. James Kronzer, Brown, Kronzer, Abraham, Watkins & Steely, Houston, Tex., for plaintiff.

Charles F. Mitchell, Asst. County Atty., Houston, Tex., for defendant.

*Memorandum and Order*

SINGLETON, District Judge.

This is a suit in admiralty in which plaintiff seeks to recover damages for bodily injuries when a motorcycle on which he was riding collided with a barricade of a drawbridge maintained by Harris County. Defendant has moved for dismissal for lack of jurisdiction.

The accident occurred on Easter Sunday, March 26, 1967. On that day Gerald Fortney, owner of a relatively small pleasure craft, was driving his vessel on Cedar Bayou approaching the bridge. Without any indication from the vessel that it was necessary to do so, the bridge keeper caused the bridge to begin to open. At that instant, when plaintiff began to cross the bridge, the barricade lowered into place and was struck by the motorcycle. Plaintiff was thrown several feet into the air and fell either on the bridge or close by. His theory of recovery is negligent maintenance.

The bridge itself is directly and permanently connected to the roadway plaintiff was traversing.[1] It is suspended over the water by permanent pilings driven into the channel of Cedar Bayou. There is no question but that the waters are navigable.

Three issues present themselves. Has plaintiff alleged maritime tort cognizable in a court of admiralty? If so, would the doctrine of sovereign immunity preclude the maintenance of this suit? If suit is not precluded by reason of sovereign immunity, does the Eleventh Amendment to the United States Constitution nevertheless bar the suit?

The answer to the first of these questions depends upon the locality of the tort. Every species of tort, however oc-

---

1. The barricade portion of the bridge with which plaintiff collided is connected with the mechanism which raises and lowers the drawbridge. The significance of that fact will be more fully discussed below.

curring and whether on board a vessel or not, upon the high seas or navigable waters is of admiralty cognizance. The Plymouth, 3 Wall. 20, 70 U.S. 20, 18 L.Ed. 125 (1865); 1 Benedict on Admiralty, section 127 (1940). Traditional admiralty jurisdiction, however, does not embrace torts occurring on bridges, wharves, and piers. Nacirema Operating Co. v. Johnson, 396 U.S. 212, 90 S.Ct. 347, 24 L.Ed.2d 371 (1969); Rodrigue v. Aetna Cas. & Surety Co., 395 U.S. 352, 89 S.Ct. 1835, 23 L.Ed.2d 360 (1969); Bird v. S. S. Fortuna, 250 F. Supp. 494 (D.Mass.1965). In Nacirema Operating Company v. Johnson, *supra,* it was appropriately said:

"Since long before the Longshoremen's Act was passed, it has been settled law that structures such as wharves and piers, permanently affixed to land, are extensions of the land. Thus, literally read, a statute which covers injuries 'upon navigable waters' would not cover injuries on a pier even though the pier, *like a bridge,* extends over navigable waters." 396 U.S. 214, 90 S.Ct. 349, 24 L.Ed.2d 375—emphasis added).

In a footnote, it was added:

"We reject the alternate holding of the Court of Appeals that all injuries on these piers, despite settled doctrine to the contrary, may now be considered injuries on navigable waters—a proposition rejected implicitly by a unanimous Court just last term. See Rodrigue v. Aetna Casualty Co., 395 U.S. 352, 360, 366, 89 S.Ct. 1835, 1839, 1842, 23 L.Ed.2d 360, 367, 370 (1969). Piers, *like bridges,* are not transformed from land structures into floating structures by the mere fact that vessels may pass beneath them." (396

U.S. 215, 90 S.Ct. 350, 24 L.Ed.2d 375 —emphasis added).

As previously indicated, the bridge upon which plaintiff was injured is supported by permanent pilings driven into the floor of Cedar Bayou. It must therefore be regarded as an extension of the land, the same as a pier or wharf would be, and therefore not within the bounds of traditional admiralty jurisdiction.

■ This conclusion, however, does not terminate the inquiry. In 1948, Congress passed the Admiralty Extension Act, 46 U.S.C. § 740, which provides:

"The admiralty and maritime jurisdiction of the United States shall extend to and include *all cases of damage or injury, to person or property, caused by a vessel on navigable water,* notwithstanding that such damage or injury be done or consummated on land.

"In any such case suit may be brought in rem or in personam according to the principles of law and the rules of practice obtaining in cases where injury or damage has been done and consummated on navigable water * * *." (Emphasis added.)

If in this instance the vessel "caused" plaintiff's injuries, there is maritime jurisdiction.[2]

■ In any given case, whether or not a person's injuries are "caused" by a ship on navigable waters within the meaning of section 740 depends in turn on the proximity of that person's relationship with the vessel. Situations in which there has been held to be a sufficient link between the injury and the ship include injuries caused by a direct collision between a ship and a bridge, Empire Seafoods v. Anderson, 398 F.2d 204 (5th Cir. 1968), or a pier, Petition

2. The legislative history of the act indicates that Congress enacted section 740 almost exclusively for the purpose of "overruling" cases such as Martin v. West, 222 U.S. 191, 32 S.Ct. 42, 56 L.Ed. 159 (1911) holding that there is no admiralty jurisdiction when a negligently operated ship on navigable waters collides with a bridge or a pier causing substantial property damage. Sen.Rep. No. 1593, 1948

U.S.Cong. & Adm.News p. 1898. The courts, however, have avoided placing such a restrictive interpretation on the statute and have held that not only does section 740 include injuries to the person, as the act explicitly states, but also includes ship-to-shore torts resulting from accessories on the vessel. See, e. g., Fematt v. City of Los Angeles, 196 F.Supp. 89 (S.D. Cal.1961).

of New York Trap Rock Corp., 172 F. Supp. 638 (S.D.N.Y.1959), the failure of a ship's winches and booms during loading operations, Strika v. Netherlands Ministry of Traffic, 185 F.2d 555 (2nd Cir. 1950), the failure of a ship's spring line, Fematt v. City of Los Angeles, 196 F.Supp. 89 (S.D.Cal.1961), and by a discharge of a ship's waste material onto the dock, Hovland v. Fearnley & Eger, 110 F.Supp. 657 (E.D.Pa.1952). Situations in which injuries have been held not to be caused by a ship include those resulting from a libelous letter written aboard a ship, Clinton v. Joshua Hendy Corp., 285 F.2d 199 (9th Cir. 1960), and a fall while plaintiff was using defendant's launching ramp to launch a small pleasure boat into navigable waters, Hastings v. Mann, 340 F.2d 910 (4th Cir. 1965).

Of particular significance is the recent decision in Gebhard v. S.S. Hawaiian Legislator, 425 F.2d 1303 (9th Cir. 1970). There, the ship was loading a cargo of container vans. The vans were brought to the pier in trucks, transferred to the water's edge by straddle carriers, and subsequently placed aboard ship by a crane. The plaintiff's job in the loading operations was to direct the straddle carriers into position beneath the crane. His injuries resulted when one of the carriers ran into him. Plaintiff thereafter sought recovery under theories of negligence and unseaworthiness against the ship and the stevedore. It was held that the Admiralty Extension Act embraced all claims against al parties.

Jurisdiction over the negligence claims against the ship was based on Gutierrez v. Waterman S.S. Corp., 373 U.S. 206, 83 S.Ct. 1185, 10 L.Ed.2d 297 (1962), where the plaintiff's injuries resulted when some beans in defective bagging which had just been unloaded from defendant's ship spilled onto the dock and caused plaintiff to fall. In construing the Extension Act, the court rejected the notion that the Act should be limited to "injuries actually caused by the physical agency of the vessel or a particular part of it—such as when the ship rams the bridge or when its defective winch drops some cargo onto a longshoreman. * * * *" (373 U.S. 209–210, 83 S.Ct. 1187–1188).

"Nothing in the legislative history supports so restrictive an interpretation of the statutory language. There is no distinction in admiralty between torts committed by the ship itself and by the ship's personnel while operating it, anymore than there is between torts 'committed' by a corporation and by its employees." (Id. at 210, 83 S.Ct. at 1188)

The court in Gebhard v. S.S. Hawaiian Legislator, supra, saw "no substantial difference between an allegation that the ship owner was negligent in allowing beans to be unloaded by means of dangerously defective bagging, and one that was negligent in allowing vans to be loaded by means of dangerously defective equipment."

The negligence claims against the stevedore in Gebhard, supra, presented somewhat a different problem. While jurisdiction depended upon whether the ship caused the injury, recovery turned upon whether the stevedoring company was negligent. In holding that the Extension Act applies to all claims arising out of a vessel-caused injury, the court said:

"The act by its terms applies to 'all cases' where the injury is 'caused by a vessel on navigable waters.' It imposes no other requirements. On its face, therefore, the act seems to base jurisdiction not on the character of the parties, as in diversity, but on the nature of the facts giving rise to the cause, and in view of the savings of time and money—both to litigants and to the courts—that result from consolidation in one action of all claims arising out of the single injury, we see no reason why we should depart from the literal meaning of the act."

The plaintiff in this suit is in a position analogous to the plaintiff in Gebhard, supra. In both cases, the injury was actually precipitated by a shore-based in-

strumentality, and yet "caused" by the ship.

**■■** That the plaintiff's injuries in this case were caused by a ship is illustrated by the fact that the bridge keeper apparently believed it was necessary to lift the bridge in order that the vessel might pass, regardless of whether it was in fact necessary to do so and regardless of whether the ship gave any indication that it was necessary to do so. Consequently, just as in the ship-to-shore tort cases cited above, there was a chain of events which began with the ship's approach to the bridge and subsequently moved landward to bring about plaintiff's injuries. It is true that in this instance neither the vessel nor any of its accessories directly caused the accident. The contention, however, that the cause must be direct was laid to rest in *Gutierrez, supra,* and *Gebhard, supra.* Similarly, the application of the Extension Act is not to be limited to only those injuries which were or should have been foreseen by the ship's personnel. Congress did not intend to inject the elusive concept of foreseeability into section 740. It is accordingly held that the harm to plaintiff was caused by a ship within the Admiralty Extension Act.

**■** There is also an alternate theory upon which admiralty jurisdiction can be based. That theory is, notwithstanding the locality of the events which gave rise to this suit, the tort is one essentially maritime in nature. Consequently, torts occurring as a consequence of the operation of drawbridges are related to that purpose and are cognizable in a court of admiralty.

**■** It has not been overlooked that the function of a bridge, as such, over navigable water is to allow vehicular and pedestrian traffic to pass from one side of the waterway to the other. The sole and exclusive function of a drawbridge, however, is to allow maritime traffic to pass along navigable water. Because a vessel was passing underneath the drawbridge in this case, and because plaintiff was injured by the movement of that bridge to allow passage, the relationship of those injuries is so substantially related to maritime commerce as to be embraced by admiralty jurisdiction.

**■** The second and third jurisdictional issues raised by the circumstances of this case are immunity under the common law doctrine of governmental immunity and under the Eleventh Amendment to the United States Constitution, respectively. The governmental immunities doctrine has its origin in the English common law and was based on the premise that the King could do no wrong. Courts on this side of the Atlantic, however, adopted the doctrine early and applied it with the same force that the English courts had theretofore applied it. The Eleventh Amendment[3] is obviously an embodiment of the immunities doctrine and represents an attempt to raise it to a level of constitutional dignity. Thus, in federal cases where governmental immunity is raised as a defense, the Eleventh Amendment is usually also raised as a matter of course. This is not to say that they are exactly alike in all respects, though a court opinion discussing waiver under one will likely discuss waiver under the other in precisely the same terms. See, e.g., Parden v. Terminal Ry. of Alabama State Docks Dept., 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964).[4]

---

3. The Eleventh Amendment provides: "The Judicial Power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or subjects of a Foreign State."

4. "Respondents rely, as did the lower courts in dismissing the action, on sovereign im-

munity—the principle that a State may not be sued by an individual without its consent. Although the Eleventh Amendment is not in terms applicable here, since petitioners are citizens of Alabama, this Court has recognized that an unconsenting State is immune from federal-court suits brought by its own citizens as well as by citizens of another State." (377 U.S.

 The Eleventh Amendment was proposed and ratified as a reaction to the early Supreme Court decision in Chisholm v. Georgia, 2 Dall. 419, 1 L.Ed. 440 (1793), in which a citizen of South Carolina was allowed to sue the State of Georgia. See Cullison, Interpretation of the Eleventh Amendment, 5 Hou.L.Rev. 1 (1967). It is settled that the Eleventh Amendment applies to suits by citizens of a state against that same state, Parden v. Terminal Railway, supra, and that it also applies to suits in admiralty. Ex Parte Madrazzo, 7 Pet. 627, 32 U.S. 627, 8 L.Ed. 808 (1833).

 At this point, it should be made clear that suits against counties, cities, and other lesser governmental units of the state are not within the Eleventh Amendment. See Wright, Federal Courts, section 46, p. 179 (1970). In County of Lincoln v. Luning, 133 U.S. 529, 10 S.Ct. 363, 33 L.Ed. 766 (1890), the Supreme Court faced the issue of whether the Eleventh Amendment applies to suits against counties. It was said:

"With regard to the first objection, it may be observed that the records of this court, for the last thirty years, are full of suits against counties, and it would seem as though by general consent the jurisdiction of the federal courts in such suits had become established. But, irrespective of this general acquiescence, the jurisdiction of the circuit courts is beyond question. The eleventh amendment limits the jurisdiction only as to suits against a state. It was said by Chief Justice Marshall, in Osborn v. Bank, [22 U.S. 738, 857,] 9 Wheat, 738, 857, [6 L.Ed. 204], * * * that 'the eleventh amendment, which restrains the jurisdiction granted by the constitution over suits against States, is of necessity limited to those suits in which the state is a party on the record.'

"While that statement was held by this court in the case of In Re Ayers, 123 U.S. 443, 8 Sup.Ct.Rep. 164, [31

L.Ed. 216] * * * to be too narrow, yet, by that decision the jurisdiction was limited only in respect to those cases in which the state is a real, if not a nominal, defendant; and while the county is territorially a part of the state, yet politically it is also a corporation created by, and with such powers as are given to it by the state. In this respect, it is a part of the state only in that remote sense in which any city, town, or other municipal corporation may be said to be a part of the state. Metropolitan R. Co. v. Dist. of Col., 132 U.S. 1, 10 S.Ct. 19, 33 L.Ed. 231." (133 U.S. 530, 10 S. Ct. 363.)

Since the State of Texas is neither a nominal nor a real party in interest, it follows that the Eleventh Amendment is no basis for dismissing this suit against Harris County. See also Hopkins v. Clemson Agricultural College, 221 U.S. 636, 31 S.Ct. 654, 55 L.Ed. 890 (1911); Graham v. Folsom, 200 U.S. 248, 26 S.Ct. 245, 50 L.Ed. 464 (1906); Brown v. Marshall County, Kentucky, 394 F.2d 498 (6th Cir. 1968); Atkins v. City of Charlotte, 296 F.Supp. 1068 (W.D.N.C. 1969—3 judge court); Schultz v. Greater New Orleans Expressway Comm., 250 F. Supp. 89 (E.D.La.1966); and N. M. Paterson & Sons, Ltd. v. City of Chicago, 176 F.Supp. 323 (N.D.Ill.1959), rev'd on other grounds, 324 F.2d 254 (7th Cir. 1963).

 The non-application of the Eleventh Amendment does not, however, overcome defendant's contentions that the suit must be dismissed on the theory of sovereign immunities. Under Texas law, the State is shielded from tort claims by two basic principles: (1) The State as a sovereign cannot be sued without its consent, and (2) even where there is consent, the State is nevertheless not liable for the torts of its agents or employees. See Comment, 23 S.W.L.J. 341 (1969). As for the non-liability rule, the main point of reference is Workman v. Mayor,

186, 84 S.Ct. 1209). Clearly, the court is applying the governmental immunity

doctrine interchangeably with the Eleventh Amendment.

etc., of New York, 179 U.S. 552, 21 S.Ct. 212, 45 L.Ed. 314 (1900). In that case, plaintiff sued various municipal officials in an in personam admiralty proceeding after a city fire boat, on its way to a fire, had collided with a vessel owned by plaintiff. It was first concluded that where there was jurisdiction over the party endowed with the attributes of sovereignty, that is, where the sovereign is amenable to process, but that decisions under local law declare the sovereign to be non-liable for the torts of its agents, the interests of uniformity in maritime matters demand that maritime law should apply to the exclusion of local law. The court then proceeded to determine whether, under maritime law, liability against the City of New York was precluded by reason of governmental immunity:

> "As a result of the general principle by which a municipal corporation has the capacity to sue and be sued, it follows that there is no limitation taking such corporation out of the reach of process of a court of admiralty, as such courts, within the limit of their jurisdiction, may reach persons having a general capacity to stand in judgment * * *. (179 U.S. 565, 21 S.Ct. 217)

> "It results that, in maritime law, the public nature of the service upon which a vessel is engaged at the time of the commission of a maritime tort affords no immunity from liability in a court of admiralty, where the court has jurisdiction. This being so, it follows that as the municipal corporation of the City of New York, unlike a sovereign, was subject to the jurisdiction of the court, the claimed exemption from liability asserted in the case at bar, because of the public nature of the service upon which the fire-boat was engaged—even if such claim for the purposes of the case be conceded—was without foundation in the maritime law, and therefore afforded no reason for denying redress in a court of admiralty for the wrong which the courts below both found to have been committed." (179 U.S. 570, 21 S.Ct. 218)

The lesson taught by Workman v. Mayor, etc., of New York, supra, has been taken to mean that state law cannot deprive a party of redress in admiralty against a municipality or a county for the negligence of its servants. In Re Nueces County, Texas, Road District No. 4, 174 F.Supp. 846 (S.D.Tex.1959). There, the county owned a ferry boat which connected two roads separated by water. The injured party had driven his car onto the boat and the car, because of an alleged unseaworthy condition on the boat, plunged into the water killing several of its passengers. *The court, after noting the distinction between immunity from process and immunity from liability, refused to apply the Texas non-liability rule:*

> "Where the Court has jurisdiction, as here, the state may not deprive an admiralty court of the right to redress a wrong, Workman v. New York City [supra]; or deprive a person of any substantial admiralty rights. Pope & Talbot, Inc. v. Hawn, 346 U.S. 406, 409, 74 S.Ct. 202, 98 L.Ed. 143." (174 F.Supp. 850)

Under the authority of *Workman*, supra, and *In Re Nueces County*, supra, there is an absolute prohibition against the application of the non-liability rule pressed by defendants.

There is, however, another point of view as to the significance of *Workman*, supra. In Alva Steamship Co., Ltd. v. City of New York, 405 F.2d 962 (2nd Cir. 1969), it was resolved:

> "What Workman does require is that a judicial inquiry be made concerning the propriety of following state law in any admiralty case where the application of that law would defeat an otherwise meritorious cause of action. The district court did not make such an inquiry. This inquiry cannot be avoided even if it is true that heretofore there has been no maritime rule in the area of governmental immunity. It is settled that even if a state law does not contravene an established principle of admiralty law in certain circumstances,

it may so disrupt the uniformity of the admiralty law in some crucial respect that it must be deemed preempted." (405 F.2d 970)

Application of the non-liability rule here would be detrimental to the uniformity of admiralty law. The Texas Legislature recently enacted a statute, article 6252-19, sec. 3, which declares that:

"Each unit of government in the State shall be liable for money damages for personal injuries or death when proximately caused by the negligence or wrongful act or omission of any officer or employee acting within the scope of his employment or office arising from the use of a motor-driven vehicle and motor-driven equipment * * *."

This provision, which became effective on January 1, 1970, would appear to cover the accident in this case if it had occurred after the effective date of the act. Thus, when state law is applied, the agents of an instrument of state government may be liable for maritime torts after, but not before January 1, 1970. The end result is the very lack of uniformity to which the *Workman* case, supra, is addressed. Accordingly, it is held that the rule which declares governmental agencies not liable for the torts of their employees, regardless of whether it is based on the common law or the Eleventh Amendment, cannot operate in derogation of substantive admiralty rights and has no application here.

■■■ This leads into the question of whether the motion to dismiss should be granted on the theory that the state is not amenable to process unless it consents to suit, the first branch of the immunities doctrine. As is true of common law sovereign immunities, the state may also waive Eleventh Amendment immunities. As is similarly true with common law sovereign immunities, the presence of an Eleventh Amendment consent to be sued is normally a matter of state law. Ford Motor Co. v. Department of Treasury of Indiana, 323 U.S. 459, 65

S.Ct. 347, 89 L.Ed. 389 (1946); Citizens Committee for Hudson Valley v. Volpe, 297 F.Supp. 809 (S.D.N.Y.1969). One of the ways by which the state can waive its immunity, under the Eleventh Amendment as well as the doctrine of sovereign immunities, is by functioning in an area within the reach of congressional power. Parden v. Terminal Railway, supra; Petty v. Tennessee-Missouri Bridge Commission, 359 U.S. 275, 79 S.Ct. 785, 3 L.Ed.2d 804 (1959); Chesapeake Bay Bridge & Tunnel District v. Lauritzen 404 F.2d 1001 (4th Cir. 1968). Where this has been done, the question of waiver is examined in terms of federal law. Petty v. Tennessee-Missouri Bridge Commission, supra.

■■■ Here, it must be concluded that Harris County has entered into an area within the ambit of federal regulations. As a general matter, it is not lawful to build a bridge over navigable waters, such as Cedar Bayou, until Congress has consented and the plans for the bridge have been submitted to and approved by the Chief of Engineers and the Secretary of the Army. See 33 U.S.C. § 401. Where the navigable portion of the stream lies wholly within the limits of a single state, the bridge may be built under authority granted by that state's legislature provided the location and the plans are submitted to the Chief of Engineers and the Secretary of the Army for their approval. Again, see 33 U.S.C. § 401. Under 33 U.S.C. § 502, the Secretary of the Army is delegated authority, after complying with certain procedural requirements, to compel alterations of those bridges over navigable waters which he, for good reason, believes to be an obstruction to free navigation on account of insufficient height, width of span, or where there is difficulty in passing the draw opening or draw span. Those who operate and maintain drawbridges over navigable waters are required by law to open them so as to allow passage of ships and other water craft. See 33 U.S.C. § 499. In view of these and various other measures taken by Congress to insure unobstructed

navigation of the navigable waters of the United States, Harris County has undertaken to operate in territory where the dictates of Congress reign supreme. To even begin construction the County was required to seek the approval of the Secretary of the Army and the Chief of Engineers as to the proposed plans and location of the bridge. By doing so, it must be held to have waived its immunity under the Eleventh Amendment. Parden v. Terminal Railway of Alabama State Docks Dept., 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964); Petty v. Tennessee-Missouri Bridge Commission, 359 U.S. 275, 79 S.Ct. 785, 3 L.Ed. 2d 804 (1959); Chesapeake Bay Bridge & Tunnel District v. Lauritzen, 404 F. 2d 1001 (4th Cir. 1968). In Parden v. Terminal Railway, supra, the plaintiff brought suit for damages under the Federal Employers' Liability Act, 45 U.S.C. § 51 et seq. The State of Alabama sought dismissal on the ground that the railway, as an agency of the state, was immune from suit and that the immunity had not been waived. The Supreme Court rejected that notion in the following terms:

"Our conclusion is simply that Alabama, when it began operation of an interstate railroad approximately 20 years after the enactment of the FELA, necessarily consented to such suit as was authorized by that Act. By adopting and ratifying the Commerce Clause, the States empowered Congress to create such a right of action against interstate railroads; by enacting the FELA in the exercise of this power, Congress conditioned the right to operate a railroad in interstate commerce upon amenability to suit in federal court as provided in the Act; by thereafter operating a railroad in interstate commerce, Alabama must be taken to have accepted that condition and thus to have consented to suit." (377 U.S. 192, 84 S. Ct. 1212)

Thus, when a state leaves a sphere that is exclusively its own and enters into activities subject to congressional regulation, it subjects itself to that regulation as fully as if it were a private person or corporation. See 377 U.S. 196, 84 S.Ct. 1207. The significance of *Parden,* supra, is that the Supreme Court found waiver by the railroad's entry into the federal realm, a matter of federal law, rather than by the legislative consent of the state, a matter of state law.

In Chesapeake Bay Bridge & Tunnel District v. Lauritzen, supra, the lesson taught by *Parden,* supra, was applied to suits in admiralty. There, a ship was damaged when snagged by a submerged obstruction at the bridge-tunnel spanning Chesapeake Bay and joining the eastern peninsula of Virginia with the mainland. The ship owner brought suit and sought recovery on the theory of maritime tort. With respect to the immunity doctrine in the Eleventh Amendment it was held:

"Nevertheless, libellant's replication must prevail—the State obstacle and the Constitutional impediment are both waivable and they have been disclaimed. Virginia relinquished both of these pleas by seeking and obtaining admission into an exclusive Federal realm—interstate and foreign commerce. Art. I, section 8, U.S.Constitution. Necessarily, the State recognized that she built in the Bay only by sufferance of the Federal government. This acknowledgment is conclusively evidenced by her petition for permission pursuant to the act of Congress, 33 U.S.C. § 401 et seq., to occupy navigable waters with bridges and tunnels. The supplication of the State, and her reception into the Federal domain, meant surrender, pro tonto and pro tempore of State sovereignty and submission to the paramount overlordship of the United States during the tenancy." (404 F.2d 1001)

Defendant contends that *Lauritzen,* supra, is distinguishable because it was not necessary to secure congressional consent before building the drawbridge over Cedar Bayou as Virginia actually did in constructing the bridge-tunnel over

Chesapeake Bay. That contention is unpersuasive. The appellate opinion in *Lauritzen,* supra, as well as the district court's opinion, 259 F.Supp. 633 (E.D. Va.1966) have been carefully read. If it were necessary for Virginia to seek the consent of Congress to construct the bridge-tunnel, no mention was made of that requirement in either opinion. The district court based its findings of entry into the federal realm on Virginia's seeking the approval of the proposed plans by the Corps of Engineers of the United States Army and the subsequent issuance by the Corps of Engineers of a condition permit to fill. Thus, *Lauritzen,* supra, supports the proposition that Harris County, by building a bridge across navigable waters, waived its immunity from suit under both the common law and the Eleventh Amendment.

It is true that some courts have placed a narrower construction upon *Parden,* supra, than was done in *Lauritzen.* See Cocherl v. Alaska, 246 F.Supp. 328 (D. Alaska 1965) and Huckins v. Board of Regents of University of Michigan, 263 F.Supp. 622 (E.D.Mich.1967). In each of these cases, the plaintiff sued under the Jones Act, 46 U.S.C. § 688, which extends to seamen the benefits of the FELA, supra, and attempted to recover also under the general maritime law. It was held in each case that *Parden,* supra, does not apply to general maritime claims, but instead applies only when a cause of action is created by an act of Congress. It must be observed that each of these cases was decided prior to the appellate opinion in *Lauritzen,* supra, and that in neither one is the district court opinion in *Lauritzen,* supra, cited, nor discussed. Thus, *Cocherl,* supra, and *Huckins,* supra, are of doubtful authoritative value. A later case, Citizens Committee for Hudson Valley v. Volpe, supra, discussed the district court opinion in *Lauritzen,* as allowing the cause of action based on a violation of federal statutes pertaining to navigation when the complaining party is a member of the class which the statutes protect. The fact remains, however, that plaintiff's cause of action in *Lauritzen,* supra, was under the general maritime law, while his theory of recovery was premised upon the violation of certain navigation laws. Moreover, it was contended in *Lauritzen,* supra, that *Parden,* supra, should be limited in application, as the courts in *Cocherl,* supra, and *Huckins,* supra, held, to cases where an act of Congress creates a cause of action. The court rejected that contention as follows:

"Furthermore, an examination of the historical background of the FELA explains, we think, the reason why that Act expressly provided a cause of action for injured railway employees. The FELA was enacted because Congress was dissatisfied with the common-law duty of the master to his servant * * *. The purpose of the FELA was to enlarge the remedy of railroad employees, and it accomplished this by eliminating the common-law defenses of contributory negligence, assumption of risk, contract not to sue, and the fellow-servant rule * * *. In essence, it substituted a new statutory remedy for an overly restricted common law remedy. *But we perceive no sound reason for holding that a state has waived its immunity from suit where a federal law expressly grants a right of action, as in Parden, and denying such a waiver when civil liability clearly exists but it is not expressly mentioned, as in this case. The proper test, we believe, is whether the state has knowingly and directly entered a field which is subject to federal regulation, such as interstate or foreign commerce. If so, it must be deemed to have consented to suit to the same extent as a private individual.* A contrary ruling would result in the same injustice which gave the Supreme Court cause for concern in the Parden case; namely, the injured parties would have a remedy when hurt by a private individual but would be remediless if the state, through its entry into the field of interstate or foreign commerce, happened to be the party at fault. When

the state elects to enter the realm of interstate or foreign commerce it must be prepared to shoulder the attendant responsibility." (259 F.Supp. 638)

The authoritative value of *Lauritzen,* supra, is strengthened by Centraal Stiksof Verkoopkantoor, N. V. v. Alabama State Docks, 415 F.2d 452 (5th Cir. 1969). There, CSV sued for damage to a cargo of commercial fertilizer stored in a warehouse of the docks. It was held that the immunity doctrine precluded suit. CSV had contended that the docks entered into a sphere of federal regulation, citing the Treaty of Friendship Commerce, and Navigation between the United States and the Netherlands; the Interstate Commerce Act, 49 U.S.C. § 1 et seq.; the Shipping Act, 46 U.S.C. § 801 et seq.; and various Coast Guard regulations relating to proper storage of cargo. The court first concluded that there was no cause of action based on any of the cited treaties, statutes, and regulations, leaving only diversity of citizenship as a basis of jurisdiction. Thus, according to the court, waiver of sovereign immunity, under that circumstance, should be a matter of state law. The *Lauritzen* case, supra, was cited and distinguished as follows:

"That case is distinguishable because the accident which gave rise to the cause of action occurred on navigable waters which involved federal admiralty jurisdiction. There, 'but for' sovereign immunity defense the injured party would have been able to maintain a cause of action under federal law. Here C.S.V. would not have been able to state a federal cause of action even if Docks had been a non-state corporation engaged in the warehouse business. In this case, the complainant is not able to invoke federal law and thus sovereign immunity is

not acting as a bar to federal relief." (415 F.2d 456)

The very feature upon which Centraal Stiksof Verkoopkantoor, N. V. v. Alabama State Docks, supra, was distinguished is the reason why the immunities doctrine has been waived here: The immunities doctrine and the Eleventh Amendment have been urged as a bar to an otherwise legitimate cause of action in admiralty. Accordingly, Harris County's invasion into this sphere of federal regulation must be deemed a waiver of its immunities under the Eleventh Amendment and the common law.

Plaintiff also asserts that there was a waiver of immunities under state law. To sustain this position, plaintiff refers to Articles 1572 [5] and 1573,[6] V.A.T.S. There is some authority in Texas case law in support of this contention. Farmers State Bank of New Boston v. Bowie County, 127 Tex. 641, 95 S.W.2d 1304 (Tex.Com.App.1939). The question presented in that case was whether or not the trial court had jurisdiction since the suit was against the county. That issue was answered in the following terms:

"The language [of Article 1573] indicates that the rejection by the commissioners' court of a claim against the county, or the failure of such court to act on the same, is merely a condition precedent to the filing of a suit to recover thereon * * *.

"The Legislature was authorized, by the terms of the constitutional provisions conferring appellate jurisdiction and control upon the district court, to exempt any particular proceeding therefrom. Appellant was authorized to, after rejection of its claims by the commissioners' court, sue to establish same in a court of

---

5. Article 1572: Each county which now exists or which may be hereafter established, shall be a body corporate and politic.

6. Article 1573: No county shall be sued unless the claim upon which suit is found-

ed shall have first been presented to the commissioners' court for allowance, and such court shall have neglected or refused to audit and allow the same, or any part thereof. (It is not questioned that this has been done.)

competent jurisdiction." (95 S.W.2d 1306)

With all candor, it must be pointed out that Farmers State Bank of New Boston v. Bowie County, supra, was not a suit for personal injuries based on tort. Nevertheless, in tort cases where the immunities doctrine has been raised, Texas courts have generally precluded recovery against counties on the theory of non-liability instead of the theory of immunity from process. See, e. g., Braissaird v. Webb County, 128 S.W.2d 475 (Tex.Civ.App.—San A.1939, no writ hist.), a wrongful death action in which the rule was stated in these terms:

"It has long been the law in Texas that a county is not liable in damages for injuries sustained in consequence of the tortious or negligent acts of its agents or employees, unless liability therefor is created by statute, either in express terms or by necessary implication."

In a very careful analysis of the governmental immunities doctrine in Texas at 23 S.W.L.J. 341 (1969), it was said:

"Theoretically, counties enjoy the same degree of immunity as the state. However, the rule granting to the county immunity from suit has been abbrogated by the Legislature [citing Article 1573]. Thus, the courts have jurisdiction to hear claims against counties, but tort claims have been generally unsuccessful because of the rule that counties are immune from liability for the torts of their agents and employees."

Thus, there is no jurisdictional obstacle to the maintaining of the suit against a Texas county. Articles 1572 and 1573 are held to be a legislative waiver of immunities from suit.

 Articles 1572 and 1573, may not, however, be construed as waiving the state's immunity under the Eleventh Amendment. An Eleventh Amendment waiver is not to be lightly inferred from any statute which purports to consent to suits against the state. Petty v. Tennessee-Missouri Bridge Commission, supra. Thus, when suits against the state are brought in Federal Court, there is no waiver based on a consent statute unless it is clear, either from the statute itself or the legislative history behind it, that there is consent to Federal suit. Ford Motor Company v. Department of Treasury, supra. This test is one which Articles 1572 and 1573 fail to meet.

 There is yet another theory of waiver advanced by plaintiff. House Concurrent Resolution 10, passed in a recent session of the Texas Legislature, provides:

"RESOLVED by the House of Representatives of the State of Texas, the Senate Concurring, THAT Frederick P. Adams be and is hereby granted permission to bring suit in any court of competent jurisdiction in Harris County, Texas, against Harris County, Texas * * * "

Obviously, this resolution was passed especially for the benefit of plaintiff and is at least a waiver of the county's common law immunity from suit in state courts of competent jurisdiction situated in Harris County. But it does not stop there. In Reagan v. Farmers' Loan & Trust Company, 154 U.S. 362, 14 S.Ct. 1047, 38 L.Ed. 1014 (1893), the plaintiff brought suit in Federal Court to challenge the validity of railroad rate charges fixed by the Texas Railroad Commission. Since the plaintiff was a citizen of a state other than Texas, the Eleventh Amendment was pled as a defense. The acts which created the Railroad Commission allowed any railroad or other party dissatisfied with the decision of the Commission to file suit "in a court of competent jurisdiction in Travis County, Texas, against said Commission as defendant."

The Court clearly rejected the argument that the Eleventh Amendment was a bar to the suit:

"The language of this provision is significant. It does not name the

court in which the suit may be brought. It is not a court of Travis county, but in Travis county. The language, differing from that which ordinarily would be used to describe a court of the state, was selected, apparently, in order to avoid the objection of an attempt to prevent the jurisdiction of the Federal Courts. The Circuit Court for the Western District of Texas is 'a court of competent jurisdiction in Travis county.' Not only is Travis county within the territorial limits of its jurisdiction, but also Austin, in that county, is one of the places at which the Court is held. 23 Stat. 35. It comes, therefore, within the very terms of the Act. It cannot be doubted that a state, like any other government, can waive its exemption from suit." (154 U.S. 392, 14 S.Ct. 1052)

The resolution granting permission to plaintiff to sue Harris County is virtually identical to the Consent Statute in Reagan v. Farmers' Loan & Trust Company, supra, except that it is, if anything, broader insofar as it allows suit against the county in *any* court of competent jurisdiction. It is, therefore, held that the terms of HCR 10 allows suit in this court notwithstanding the Eleventh Amendment.

The result here reached is in accord with the decisions in Ex Parte New York, 256 U.S. 490, 41 S.Ct. 588, 65 L.Ed. 1057 (1920); J. Ray McDermott & Co. v. Department of Highways, State of Louisiana, 267 F.2d 317 (5th Cir. 1959); and Broward County, Florida v. Wickman, 195 F.2d 614 (5th Cir. 1952). In Ex Parte New York, supra, it was held that "the immunity of a state from suit *in personam* in the admiralty by a private person without its consent is clear." (256 U.S. 500, 41 S. Ct. 590) Broward County, Florida v. Wickman, supra, and J. Ray McDermott & Co. v. Department of Highways, supra, followed Ex Parte New York, supra, and hold essentially the same. Since it has been concluded that Harris County is

suable, these authorities are inapposite to *Workman*, supra, *In Re Nueces County*, supra, and have no application to the matter at hand.

In Fylipoy v. Gulf Stevedore Corporation, 257 F.Supp. 166 (S.D.Tex.1966), a suit against the Harris County Houston Ship Channel Navigation District was dismissed primarily because the state statute which allowed suits against the District in state court would not permit a construction which would allow suit in federal court. It was argued, on the authority of In Re Nueces County, Texas, Road District No. 4, supra, that the non-liability rule did not apply to admiralty causes of action. That notion was rejected with the statement that "the *McDermott* case does not separate the question of immunity from suit from that of liability in tort, and consequently the case is persuasive authority for the proposition that the fact that a case sounds in admiralty does not take it out of the non-liability rule." In the *Nueces County, Texas Road District* case, supra, the Court, as previously mentioned, observed, "There is a distinction between *immunity from process*, and *immunity from liability*, which deals with the substantive law of admiralty." (174 F.Supp. 846) That distinction was tacitly recognized both in Broward County, Florida v. Wickman, supra, and J. Ray McDermott & Co. v. Department of Highways, State of Louisiana, supra, but was not discussed in *Fylipoy*, supra, and, therefore, *Fylipoy*, supra, does not appear to be contrary to the analysis and result reached in this opinion.

In Garcia v. Lykes Bros. S. S. Co., C.A. 67–H–286 (S.D.Tex.1969), this Court granted without written opinion a motion by the Harris County Houston Ship Channel Navigation District to be dismissed from the suit. This motion was based on the two grounds presented in it, namely the sovereign immunities doctrine and the Eleventh Amendment to the United States Constitution. It must be said in that regard that to the same extent that Art. 1573 is a legislative grant for suits against counties,

Art. 8263e, Sec. 75,[7] V.A.T.S., is a legislative grant for suits against navigation districts. In the area of claimed immunity from tort liability, navigation districts and other political subdivisions of the state have been given the same judicial treatment as that afforded counties. See Smith v. Harris County-Houston Ship Channel Navigation District, 330 S.W.2d 672 (Tex.Civ.App.—F.W. 1957, no writ hist.). Accordingly, this Court has reexamined the entire scope of reasoning upon which dismissal of the Navigation District in *Garcia,* supra, was predicated. If the *Garcia* motion were presented to the Court today based upon the same grounds as it was originally submitted, this Court would have to consider such a motion in the light of the thoughts and conclusions expressed by this Opinion.

For the foregoing reasons defendant's motion to dismiss for want of jurisdiction is denied. The Clerk is directed to file this Memorandum and Order and send copies to the attorneys of record.

---

7. Art. 8263e, Sec. 75: All navigation districts established under this Article may * * * sue and be sued in all courts of this State * * *.