Michael J. **CALLAHAN**, Plaintiff,

v.

**CHERAMIE BOATS, INC.**, and **Shell Oil Company**, Defendants.

Civ. A. No. 73-179.

United States District Court,
E. D. Louisiana.

Aug. 15, 1974.

Donald V. Organ, New Orleans, La., for plaintiff.

Donald L. King, Edward J. Koehl, Jr., New Orleans, La., for Shell Oil Co.

James H. Daigle, Terrence C. Forstall, New Orleans, La., for Cheramie Botruc and Lefty Cheramie Boat Co.

ALVIN B. RUBIN, District Judge:

On July 31, 1974 a number of motions were presented to the court by Cheramie Boats Inc. (Cheramie) and Shell Oil Co. (Shell). While the court ruled on each at that time, it indicated that written reasons would be forthcoming in support of the rulings. Before detailing those reasons, however, some prefatory comment may be necessary. At oral argument several references were made by the parties to the order entered April 11, granting Shell's motion for summary judgment with respect to the plaintiff's claim against Shell. At that time the court remarked, and again notes here, that the April 11 order dealt *solely* with the claim against Shell. If perchance language in that order in some manner inadvertently touches on the issues now before the court, it is hereby amended to the extent necessary to limit it to the Shell claim.

The facts of this matter are simply stated. On June 19, 1970, Callahan and several co-employees began to work on a fixed platform owned by Shell. The plaintiff was employed as a rigger by Fluor Ocean Services, Inc. Fluor had contracted with Shell to work on Shell's fixed platform; Shell had also contracted with Cheramie Boats, Inc. to provide Fluor's employees with water transportation aboard the BOTRUC II to and from the platform. After unloading some of Fluor's equipment onto the rig, plaintiff was told to return to the vessel and secure some ice for making ice water. Having obtained the ice, plaintiff chose to return to the platform by riding with another Fluor employee aboard a cargo basket hanging from a crane that was attached to the Shell rig. The crane operator, a Fluor employee, raised the cargo basket until it was nearly level with the platform, when it suddenly began to drop, falling almost to the vessel before the operator was able to halt its descent. Apparently, the sudden braking of the basket's fall flung the plaintiff from the basket and onto the deck of the vessel, causing the injuries of which he now complains.

I. Jurisdiction Over the Subject Matter

A. Unseaworthiness

Cheramie filed a motion to dismiss the plaintiff's action against it or, alternatively, for summary judgment, contending that the court lacked jurisdiction over the claim against it. Plaintiff had based his claims against Cheramie on two theories—unseaworthiness and negligence. Because it was clear that Callahan was not a member of the crew of the M/V BOTRUC II, the claim for unseaworthiness depended upon a finding that he was performing work on the vessel traditionally done by seamen. See Seas Shipping Co. v. Sieracki, 1946, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099. Specifically, it was argued that on the day in question Callahan aided in the unloading of the BOTRUC.

In fact, there was some question as to what extent, if any, Callahan had aided in the discharge of cargo from the vessel. Additionally, the facts seemed to show that any unloading of the vessel

had been completed more than an hour prior to the time when Callahan was sent from the platform back aboard the BOTRUC to secure some ice, a mission by all appearances personal, or at least for the convenience of his superiors on the platform.

■ But even if these facts were to be resolved in plaintiff's favor, Callahan would still not have a claim against Cheramie for unseaworthiness. The basis for the unseaworthiness claim is that the malfunction or negligent operation of the platform's crane rendered the BO-TRUC unfit. However, the alleged faulty appliance was clearly not an appurtenance of the vessel. Instead, the crane was permanently attached to the platform and the law no longer recognizes a claim based on unseaworthiness under those circumstances. See Victory Carriers v. Law, 1971, 404 U.S. 202, 92 S.Ct. 418, 30 L.Ed.2d 383. In *Victory Carriers* the court pointed out that the focus of any inquiry where a longshoreman is injured is not simply whether he was engaged in loading or unloading the vessel; at best, that would simply establish his status as a "Sieracki seaman." But not even a blue water seaman can recover for unseaworthiness where there is no contention that the vessel, her appurtenances, cargo or crew were not fit for the use intended, either temporarily or otherwise. See, generally, Usner v. Luckenbach Overseas Corp., 1971, 400 U.S. 494, 91 S.Ct. 514, 27 L.Ed.2d 562; Earles v. Union Barge Line Corp., 3 Cir. 1973, 486 F.2d 1097. The mere fact that a Sieracki seaman's injuries were caused by an "uncraneworthy crane" not a part of the vessel, even if the injuries occur on board the vessel, is not sufficient to establish a claim based on the unseaworthiness of the ship. See Burns v. Anchor-Wate Co., 5 Cir. 1972, 469 F.2d 730; cf. Deffes v. Federal Barge Lines, 5 Cir. 1966, 361 F.2d 422.

The motion to dismiss is therefore GRANTED with respect to any claims based on the unseaworthiness of the M/V BOTRUC.

**B. Negligence**

■ Plaintiff's negligence claim springs from that line of jurisprudence often referred to as the "gangplank cases." See, e. g., Kermarec v. Compagnie Generale Transatlantique, 1959, 358 U.S. 625, 79 S.Ct. 406, 3 L.Ed.2d 550; The Admiral Peoples, 1935, 295 U.S. 649, 55 S.Ct. 885, 79 L.Ed. 1633; Tullis v. Fidelity & Cas. Co., 5 Cir. 1968, 397 F.2d 22; The Ocracoke, E.D.Va.1908, 159 F. 552; Norris, Maritime Personal Injuries, sections 98–101. Courts sitting in admiralty have long recognized an obligation on the part of a carrier to furnish its passengers with a reasonably safe means of boarding and leaving the vessel. Norris, *supra*, section 99.

It is undisputed that Cheramie was a hired carrier transporting Callahan and his fellow employees to Shell's platform. Nor is it contested that Callahan had once safely disembarked from the BO-TRUC, had returned to the vessel by way of the platform's ladder, and was on his way back to the rig when the accident occurred. Callahan says that, when he sought to leave the ship, she was four to five feet away from the rig, making it impossible for him to reach it. Faced with this situation, he took advantage of his co-employee's offer to ride up to the platform on a basket attached to the crane. And it was during this lift that the basket fell.

Whether plaintiff will ultimately prove that he was unable to disembark from the BOTRUC except by way of the crane, that, for example, this method was foreseeably unsafe, and thus that Cheramie failed in its duty to provide him with a reasonably safe means of egress, is not a question that may be answered at this time. The reason is of course obvious: the facts have not yet been developed to a point where the court could reasonably rule on these issues. Rather, because of the rapidly approaching trial date and, more importantly, the unsettled state of the factual allegations, resolution of these and other questions must now await trial.

But one threshold issue at least may be determined—whether the court has jurisdiction over the claim. As noted above, the failure of a vessel to provide a passenger with a safe means of egress has traditionally given rise to a maritime tort action. However, it is suggested by counsel for Cheramie that there is no admiralty jurisdiction here because the injury occurred on the fixed platform, hence land.[1]

Here there was an alleged breach of duty on a vessel by its crew. Any negligence that may be attributed to Cheramie took place on board the BOTRUC. Following Cheramie's thesis, if Callahan had been forced to jump from the BOTRUC onto the platform and, upon landing on the rig, had slipped and fallen upon the structure, the court would have no jurisdiction. A fortiori, under that theory, if Callahan had fallen not onto the platform but had slipped directly into the sea, there would be admiralty jurisdiction.

This court cannot subscribe to this reasoning. A shipowner should not be able to escape liability for what has traditionally been a maritime tort on the circumstance that events set in motion aboard ship culminated on land. In fact The Admiral Peoples, above, concerned just such an instance where the plaintiff fell upon the dock and the court found admiralty jurisdiction.

In addition, the facts here fall within the parameters of the Admiralty Extension Act, 46 U.S.C. section 740:

"The admiralty and maritime jurisdiction of the United States shall extend to and include all cases of damage or injury, to person or property, caused by a vessel on navigable water, notwithstanding that such damage or injury be done or consummated on land."

See Gutierrez v. Waterman SS Corp., 1963, 373 U.S. 206, 83 S.Ct. 1185, 1188, 10 L.Ed.2d 297:

"We think it sufficient for the needs of this occasion to hold that the case is within the maritime jurisdiction under [the Act] when, as here, it is alleged that the shipowner commits a tort while or before the ship is being unloaded, and the impact of which is felt ashore at a time and place not remote from the wrongful act."[2] See generally Annot., 14 ALR Fed. 664.

In Adams v. Harris County, S.D.Tex. 1970, 316 F.Supp. 938, a motorcyclist was injured in a collision with a drawbridge barricade, lowered when a vessel approached the bridge. The court found admiralty jurisdiction based on the Admiralty Extension Act, holding that the vessel "caused" the lowering of the barricade, thus causing the accident within the meaning of the Act. On appeal the Fifth Circuit reversed, holding that because there were no allegations of negligence against the vessel, or that the vessel had hit the bridge or the cyclist, "that the dropping of the barricade was solely the act of the bridge keeper and no act of the vessel proximately caused his negligence, if there was any." 1972, 452 F.2d 994, 996–997.

But the reasoning of the Fifth Circuit decision in Adams supports a finding of jurisdiction here. Allegations of negligence are clearly stated against Cheramie, through the acts of its vessel and crew. The theory of the action can be discerned immediately from the pleadings and memoranda: Callahan's injuries were a direct and proximate result of the failure of Cheramie to provide him with a safe means to leave the vessel. In this respect it seems evident that it is alleged that the vessel

---

1. In point of fact, although not determinative, it is apparently undisputed that plaintiff actually *landed* on the M/V BOTRUC when he fell from the basket.

2. Nacirema Operating Co. v. Johnson, 1969, 396 U.S. 212, 90 S.Ct. 347, 24 L.Ed.2d 371, involving pier side injuries caused by a ship's crane is not apposite. Although the court found no coverage under the LHWCA for the plaintiffs, it noted in dictum that admiralty jurisdiction may have been present under the Admiralty Extension Act.

"caused" the injuries as required by the Act.[3]

The court in no way intimates whether plaintiff will ultimately prove a case of liability against Cheramie. Nor does it now pass on what effect, if any, Shell's alleged intervening negligence may have on the claim against Cheramie. But as now stated, and as the court perceives the parameters of maritime law, the claim is within its admiralty jurisdiction.

The motion to dismiss for lack of jurisdiction is accordingly denied.

And because, as noted above, questions surrounding the material facts of the incident have not yet been resolved, the motion for summary judgment is likewise Denied.

## II. The Motion to Amend.

■ Cheramie now seeks to amend its cross-claim against Shell to include a claim for *Ryan*-type indemnity. See Ryan Stevedoring Co. v. Pan-Atlantic SS Corp., 1956, 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133. The theory of this claim is that Shell breached its implied warranty to perform the transfer operation in a workmanlike manner. Professor Moore points out that the courts have shown a liberal attitude in their application of Rule 15, F.R.Civ.P. (Amended and Supplemental Pleadings), and frequently allow amendment where the moving party has not been guilty of bad faith and the party in opposition has not been prejudiced. Moore's Federal Practice, ¶ 15.80 [2].

Answers to questions put by the court to the parties at oral argument convince me that Shell will not suffer from this amendment, other than to be obliged to do the work normally required in answering and defending a lawsuit. And certainly if amendment were denied, Cheramie would have a right to bring this claim against Shell at a later time in a separate suit. Judicial economy, to the extent it should be considered, thus points toward amendment.

For these reasons, the motion to amend will be Granted.

## III. The Motion by Shell to Dismiss Cheramie's First Cross-Claim

■ Before its amendment, Cheramie's cross-claim was founded solely on a right to indemnity from Shell on the tort theory of active and passive negligence: that is, if it were shown that Cheramie was liable to Callahan, its negligence would be only of a "passive" nature and Shell should bear the ultimate responsibility because it was "actively" negligent.

Shell sought to have this claim dismissed on two grounds. First, because there was a charter agreement between Shell and Cheramie, it was contended that this would preclude any indemnity based on tort principles. Reliance was placed on the following language in Transcontinental Gas Pipe L. Corp. v. Mobile Drilling Barge, 5 Cir. 1970, 424 F.2d 684, 692 n. 7: "[C]onsiderations of active and passive negligence are inapplicable when dealing with contractual indemnity." But this means only that tort indemnity has no place in an examination of contractual indemnity, not that one exists to the exclusion of the other. And this interpretation finds support in the later case of Barrios v. Louisiana Construction Materials Co., 5 Cir. 1972, 465 F.2d 1157, where the court said, "This right of indemnity [based on tort principles] arises independently of any contractual rights of indemnity which the parties may have." *Id.* 1166. See also Kelloch v. S & H Subwater Salvage, Inc., 5 Cir. 1973, 473 F.2d 767.

Even if the existence of contractual indemnity were to preclude resort to the tort theory, counsel for Shell points to no indemnity provision in its contract

---

3. The Supreme Court has ruled that there is no admiralty jurisdiction in actions involving shoreside injuries caused by pier-based appliances. Victory Carriers, Inc. v. Law, 1971, 404 U.S. 202, 92 S.Ct. 418, 30 L.Ed.2d 383. But that decision would be no bar here where there are allegations of direct causation by the ship and its crew.

with Cheramie. Obviously, then, that contract is no bar to the claim.

 Shell next contends that, because both it and Cheramie are named insureds under a policy of liability insurance allegedly obtained by Cheramie pursuant to its charter with Shell, Cheramie may not cross-claim. But Shell cites no authority for the proposition that Cheramie is barred from suing Shell because they have each placed insurance with the same company.

The court need not now search through the cases in an attempt to ascertain whether there is authority either to confirm Shell's theory or show it to be without merit, for the argument is founded on the mistaken assumption that the insurer and insured are one and the same. Here both Shell and Cheramie are named parties in the lawsuit and the court is under no obligation—indeed may have no right—to look beyond the pleadings to determine who stands behind these named parties. The Federal Rules of Civil Procedure allow defendants to file cross-claims against one another, Rule 13(g), F.R.Civ.P., and the court finds no reason why it should bar Cheramie from exercising that privilege.

The motion to dismiss the cross-claim is Denied.

IV. The Motion to Strike the Jury Demand.

 In addition to the other motions, Cheramie renewed its motion to strike the plaintiff's jury demand. Cheramie urged that the only remaining claim in plaintiff's suit was based on maritime tort and that there was no diversity of citizenship between the parties.

It is well settled that a suit sounding solely in admiralty and brought under the court's maritime jurisdiction does not give rise to a right to a jury trial. Robinson on Admiralty, p. 2; Norris, The Law of Seamen, section 4; Norris, Maritime Personal Injuries, section 81. This fact was brought to the attention of counsel for plaintiff and he requested additional time to address the issue. The court informed counsel that he had five days in which to respond, failing in which the motion would be granted.

As of this time, well after the five day deadline has passed, no memorandum has been received from the plaintiff. Because it is well founded, the motion to strike the jury demand will accordingly be granted.