Michelle OLIVER, by her father and next friend, Robert Jones, et al., Plaintiffs,

v.

KALAMAZOO BOARD OF EDUCATION, a Body Corporate, and Michigan State Board of Education, a Constitutional Body Corporate, Defendants.

No. K88–71 C.A.

United States District Court,
W. D. Michigan, S. D.

Nov. 5, 1976.

**32**

Philip L. Hummer, Richard A. Enslen, Kalamazoo, Mich., Nathaniel R. Jones, New York City, Louis Lucas, Memphis, Tenn., for plaintiffs.

Kalamazoo Board of Education, Arthur Staton, Jr., Kalamazoo, Mich., Michigan

State Board of Education, George L. McCargar, Asst. Atty. Gen., Lansing, Mich., for defendant.

## OPINION

FOX, Chief Judge.

In the Emergency School Aid Act of 1972 (ESAA), Congress authorized awards of attorney fees to successful plaintiffs in school desegregation suits.[1] Plaintiffs in this action brought suit to desegregate the public schools of Kalamazoo, proved their case at trial, and were afforded relief.[2] The trial court decision was upheld by the Sixth Circuit Court of Appeals and review was denied by the Supreme Court.[3] At the conclusion of proceedings on the merits, plaintiffs petitioned the court for an order awarding attorney fees and costs against the defendants. The local defendants (primarily the Kalamazoo Board of Education) reached a settlement with plaintiffs as to fees and costs, and are no longer directly involved in this action. The liability of the state defendants is thus the sole remaining issue.

Each side was given ample opportunity to brief and orally argue every aspect of this question, including both the issue of liability itself and the reasonableness of the amount to be awarded. The state defendants vigorously assert that they are shielded from liability for an award of attorney fees by the doctrine of sovereign immunity, incorporated in the Eleventh Amendment of the United States Constitution. They argue that this amendment precludes any judgment to be paid by them from state funds, and that the ESAA is unconstitution-

1. ESAA, section 718, 20 U.S.C. § 1617, provides:

"Upon the entry of a final order by a court of the United States against a local educational agency, a State (or any agency thereof), or the United States (or any agency thereof), for failure to comply with any provision of this chapter or for discrimination on the basis of race, color, or national origin in violation of title VI of the Civil Rights Act of 1964, or the fourteenth amendment to the Constitution of the United States as they pertain to elementary and secondary education, the court, in its discretion, upon a finding that the proceedings

were necessary to bring about compliance, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs."
Pub.L. 92–318, Title VII, § 718, June 23, 1972, 86 Stat. 369.

2. *Oliver v. Kalamazoo Board of Education et al.*, 368 F.Supp. 143 (W.D.Mich.1973).

3. *Oliver v. Michigan State Board of Education et al.*, 508 F.2d 178 (C.A. 6, 1974), cert. denied, 421 U.S. 963, 95 S.Ct. 1950, 44 L.Ed.2d 449 (1975).

al to the extent that it purports to permit such an award. After carefully considering all of the arguments presented, I tentatively ruled at the close of the hearing on this issue that the state is liable and not immune. It is the purpose of this opinion to reaffirm and finalize that preliminary ruling, and to delineate the specifics of the award.

I find that the state is liable for attorney fees under the terms of § 718, and that neither of the arguments made in support of the state's defense of sovereign immunity—lack of consent or the Eleventh Amendment—is valid. These issues are independent of one another. If the state has waived whatever immunity it has for purposes of this suit, then the Eleventh Amendment claim is irrelevant. If the Eleventh Amendment itself is no bar because it is superseded by Congressional legislation enacted pursuant to the Fourteenth Amendment, then the consent argument is superfluous. Since defendants have pressed both claims, I am addressing each, but I wish to make it clear that plaintiffs need only prevail on one or the other to prove their entitlement to fees.

In Section I of this opinion, I address the waiver of immunity issue, and in Section II, the relationship between the Eleventh and Fourteenth Amendments. Section III discusses the statutory predicates for the fee award, and defendants' nonconstitutional objections to the award. Section IV outlines the rationale for the actual amount of fees awarded, and details the award.

## I.  CONSENT

█ The State of Michigan has waived its sovereign immunity for the purposes of this case by statutorily authorizing the State Board of Education to sue and be sued.[4] According to the Sixth Circuit's

holding in *Soni v. Board of Trustees of the University of Tennessee*, 513 F.2d 347 (C.A. 6, 1975), the state has thereby exposed itself to monetary judgments and thus there is no bar to the award of attorney fees in this case.

The Sixth Circuit held in *Soni* that just as the power to sue grants the right to recover a money judgment, consent to be sued inescapably subjects [the state] to the corollary hazard of having a money judgment rendered against it, 513 F.2d at 353. The state, in its supplemental brief, argues that *Soni* is inapposite, and that M.C.L.A. § 388.-1007 does not waive its sovereign immunity, for three reasons: first, because this judgment would expend itself on the public treasury, second, because the language of the statute interpreted in *Soni* is different from that of the Michigan statute, and third, because the Michigan Court of Claims Act, M.C.L.A. § 600.6401 et seq., M.S.A. § 27A.6401 et seq., precludes the federal court from exercising jurisdiction over the matter.

### A.

The court notes at the outset that the differences between the case at bar and *Soni*, which defendant emphasizes, are less apparent than the similarities. It is significant that the court in *Soni* assumed for purposes of the decision that the suit was in fact an action against the state for purposes of the Eleventh Amendment. 513 F.2d at 352. The University of Tennessee, like the Michigan State Board of Education, is a body corporate. 513 F.2d at 351; M.C.L.A. § 388.1007. Both, according to their respective statutes, can sue or be sued, plead and be impleaded. The only real factual distinction urged by the state defendants is that "the University of Tennessee receives income from many sources in addition to

---

4.  The exact language of the statute, M.C.L.A. § 388.1007; M.S.A. § 15.1023(7), is as follows: "[Body corporate; powers.] Sec. 7. The state board of education is a body corporate and may purchase, have, hold, possess, enjoy, grant, alien, invest, sell, and dispose of real and personal property of every kind; may sue and be sued, plead and be impleaded in all the

courts in this state; may have, use, alter and renew a seal; and may make such ordinances, bylaws and regulations as it deems proper for the government and conduct of the board and for the transaction of its business and the operation of the state institutions under its control if they are not repugnant to the constitution or laws of this state or of the United States.

substantial legislative appropriations." [Supplemental brief, p. 1.] "The sole source of 'income' of the State Board of Education," it argues, "is legislative appropriations. It does not receive income from many sources in addition to legislative appropriations." While there is no evidence to support or derogate from this latter assertion by the defendant, the court notes that M.C.L.A. § 388.1008, M.S.A. § 15.-1023(8) states:

"The state board of education may take by gift, grant from federal or other sources, devise, bequest, or in any other lawful manner, property, money, pledges or promises to pay money . . . ."

Whether the state in fact receives income from other sources pursuant to this section, however, is immaterial, because this alleged distinction is made to support the conclusion that "(a)ny judgment against the State Board of Education (or the Superintendent of Public Instruction) 'would expend itself on the public treasury or domain.'"

This conclusion begs the question, which is whether the state has consented to be sued. Since the court holds that it has— that the state has voluntarily waived its immunity from judgments which "would expend themselves on the public treasury" —the defendant is in effect only arguing that what the state has agreed to let happen will happen.

### B.

■ The precise statutory language by which Michigan waives immunity of the State Board of Education is as follows:

"The state board of education is a body corporate and . . . may sue and be sued, plead and be impleaded in all the courts in this state . . . ."

The defendant argues that this language is "materially different" from that of the Tennessee statute held by the *Soni* court to waive sovereign immunity, viz.: "(The University) may sue and be sued, plead and be impleaded, in any court of law or equity in this State or elsewhere."

■ I disagree, and find no reason why the language of the Michigan statute

should not be given full effect. Clearly by its terms it does not limit access to this court; rather it specifically authorizes suit in "*all the courts in this state.*" Defendant does not cite, nor does the court find, any legislative history of the statute evincing an intent to restrict this waiver of immunity to state courts. Of course, a state could, if it so desired, waive immunity only with respect to its own courts, without consenting to be sued in federal courts, *Smith v. Reeves,* 178 U.S. 436, 445, 20 S.Ct. 919, 44 L.Ed. 1140 (1900). Courts generally scrutinize waivers of immunity carefully, *Edelman v. Jordan,* 415 U.S. 651, 673, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), and in a number of cases have found that ambiguous, arguably consenting language constituted a waiver only as to state courts, and not federal courts. See, e.g., *Ford Motor Co. v. Indiana Department of Treasury,* 323 U.S. 459, 65 S.Ct. 347, 89 L.Ed. 389 (1945); *Kennecott Copper Co. v. State Tax Commission,* 327 U.S. 573, 66 S.Ct. 745, 90 L.Ed. 862 (1946); *Great Northern Ins. Co. v. Read,* 322 U.S. 47, 64 S.Ct. 873, 88 L.Ed. 1121 (1944). Such cases, however, have generally involved proceedings of a special character, concerning matters traditionally and peculiarly within the province of the state, especially state fiscal and tax matters. The Sixth Circuit in *Soni,* citing *Ford Motor Co.,* supra, recognized this distinction. 513 F.2d at 353.

Moreover, a number of courts have found a waiver of immunity in both federal and state courts based on language similar to, or even more restrictive than that involved here. See *Reagan v. Farmers Loan and Trust Co.,* 154 U.S. 362, 392, 14 S.Ct. 1047, 38 L.Ed. 1014 (1894); *Gerr v. Emrick,* 283 F.2d 293, 298 (C.A. 3, 1960); *Knighton v. Johnston Co.,* 330 F.Supp. 652 (E.D.N.C. 1971); *Adams v. Harris Co., Tex.,* 316 F.Supp. 938, 950 (S.D.Tex.1970).

In *Reagan,* the United States Supreme Court construing a Texas statute, said:

"  . . . Section 6 provides that any dissatisfied 'railroad company, or other party at interest, may file a petition' 'in a court of competent jurisdiction in

Travis County, Texas, against said commission as defendant.' The language of this provision is significant. It does not name the court in which the suit may be brought. It is not a court of Travis County, but in Travis County."

In *Gerr*, the Third Circuit found that a provision of the Pennsylvania Turnpike Act stating that actions could "be brought only in the proper courts at the county of Dauphin" authorized suit in the U.S. District Court for the Middle District of Pennsylvania, situated in that county. Likewise, in *Adams*, supra, the court, relying on *Reagan*, held that the Eleventh Amendment did not bar an action in federal court pursuant to a statute authorizing "suit in any court of competent jurisdiction in Harris County, Texas, against Harris County, Texas." In *Knighton* the court interpreted a North Carolina statute waiving governmental immunity to the extent of any liability insurance coverage.

"The statute expressly authorizes a suit 'in *any* court of competent jurisdiction *in* such county. The legislature did not attempt to limit jurisdiction to a *state* court in such county, nor to a court *of* such county. . . .

"This court is of the opinion, and so holds, that it is a court of competent jurisdiction in Johnston County within the meaning of G.S. § 153–9(44)." [Emphasis in original.]

■ The Michigan consent statute is inclusive—it authorizes suit in *all* courts, not merely state courts; and in all the courts *in* this state, not *of* this state. Like the stat-

utes in *Soni* and the other cases cited, it effects a waiver as to suits in both federal and state courts.[5]

The decision of the Sixth Circuit in *Long v. Richardson*, 525 F.2d 74 (C.A. 6, 1975), does not suggest a different result in this case. *Long* essentially reaffirmed *Soni*, and emphasized that each claim of waiver must be evaluated individually. The court found that there was insufficient indication that the State of Tennessee intended to waive the immunity of Memphis State University. It held that no clear waiver could be found in the following language, which plaintiffs relied upon to establish their claim:

"The board shall have such other powers as are necessary . . . and it is the expressed legislative intent and purpose to vest similar and comparable responsibility and authority in the board as is authorized for the board of trustees of the University of Tennessee. . . ." [T.C.A. § 49–3239 Supp. 1974.]

This oblique language, ambiguously piggybacking the statutory rights and responsibilities of Memphis State University on those of the University of Tennessee, is in sharp contrast to the Michigan statute which, like the provision in *Soni*, clearly spells out the consent to sue and be sued.

## C.

■ The court finds no conflict between its exercise of jurisdiction over the case at bar and the Michigan Court of Claims Act. While defendants in their brief accurately set out the principal section of that act, viz:

---

5. Plaintiffs have also argued that the state defendants waived their immunity simply by participating as defendants in this lawsuit, and particularly by their actions in joining with their codefendants to recover $32,000 in costs from the plaintiffs for their excessive designations to the appellate record. (See *Oliver v. Michigan State Board of Education, et al.*, 519 F.2d 619 (C.A. 6, 1975), rehearing denied June 18, 1975).

The sovereign immunity of a state cannot be waived by the actions of its officers in defending a lawsuit unless those officers are clearly authorized to effect such a waiver. *Ford Motor Co. v. Dept. of Treasury of State of Indiana*, 323 U.S. 459, 65 S.Ct. 347, 89 L.Ed. 389 (1945);

*Georgia RR and Banking Co. v. Redwine*, 85 F.Supp. 749 (D.Ga.1949), rev'd, 342 U.S. 299, 72 S.Ct. 321, 96 L.Ed. 335 (1952). A statute like the one involved in this case, providing general consent to be sued, obviates a finding that waiver is implied by the actions of the state defendants. While these actions standing alone would be insufficient to establish a waiver in the absence of statutory authority, however, they are cogent evidence that the statute, M.C.L.A. § 388.1007, means what it says. The full participation of the state in this federal lawsuit is consonant with the court's interpretation of the statute as authorizing suits by or against the state in the federal courts.

"(1) Except as provided in section 6440, the jurisdiction of the court of claims as conferred upon it by this chapter over claims and demands against the state or any of its departments, commissions, boards, institutions, arms or agencies, shall be exclusive. . . ." M.C.L.A. § 600.6419; M.S.A. § 27A.6419,

they neglect to either quote or discuss the exception referred to therein. A reading of § 6440 shows that it is dispositive of the defendants' argument:

"*No* claimant *may be permitted to file in [the court of claims]* against the state nor any department, commission, board, institution, arm or agency thereof *who has an adequate remedy upon his claim in the federal courts* . . . ." [Emphasis added.]

Plaintiffs' claim arises under federal law, principally the Emergency School Aid Act of 1972. Thus, it is clear that far from being barred from the federal court because the Court of Claims has exclusive jurisdiction, as the defendant argues, the plaintiffs would to the contrary be barred from the Court of Claims because of their federal remedy.

Cases cited by defendant as authority for its assertion that claims against the state for money may be prosecuted only in the Court of Claims are distinguishable because none involved federal law. *Glass v. Dudley Paper Co.*, 365 Mich. 227, 112 N.W.2d 489 (1961), was a personal injury tort action. *Fox v. Board of Regents of The University of Michigan*, 375 Mich. 238, 134 N.W.2d 146 (1965), involved claims of breach of warranty, malpractice, and breach of contract. *Sprik v. Regents of the University of Michigan*, 43 Mich.App. 178, 204 N.W.2d 62 (1972), aff'd, 390 Mich. 84, 210 N.W.2d 332 (1973), involved landlord-tenant law and a distinction between rent and taxes. Each of these cases involved state law claims, and none is relevant to the case at bar, which clearly falls within the "federal remedy" exception.

Nor does *Copper SS Co. v. Michigan*, 194 F.2d 465 (C.A. 6, 1952), cited by defendants in their supplemental brief, alter this result.

That case was a libel action in admiralty to recover for damages resulting from a boat collision. Plaintiff there contended that the federal court had jurisdiction because the State of Michigan had implicitly waived its sovereign immunity by enacting the Court of Claims Act. 194 F.2d at 467. The Sixth Circuit, affirming the district court, held that the Act clearly waived immunity from suit with respect to actions filed in the Court of Claims, but did not constitute consent to be sued in the federal courts. Further, it found that "there was no intention in creating the Court of Claims to enlarge or extend the existing jurisdiction of the federal court over the State or any of its departments, commissions or agencies." 194 F.2d at 468.

*Copper SS Co. v. Michigan* is entirely inapposite to the case at bar. The state explicitly consents to suits against the Board of Education in M.C.L.A. § 388.1007, and no one has argued that the waiver of immunity stems in any way from the Court of Claims Act. Plaintiffs do not mention the Court of Claims, nor should they, since it is totally irrelevant to this case. The Sixth Circuit in *Copper SS Co.* specifically notes, in the portion of its opinion quoted in defendant's brief, that "claims that [are] or might be enforcible in the federal courts" are outside the purview of the Court of Claims.

It is abundantly clear that the State of Michigan has waived the immunity of the defendants in this case from federal suits, and that under the *Soni* decision they are liable to the plaintiffs for the attorney fees I am awarding today.

## II. THE FOURTEENTH AMENDMENT SUPERSEDES THE ELEVENTH AMENDMENT FOR PURPOSES OF THIS CASE

The Fourteenth Amendment provides in part:

"Section 1. . . . No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; [n]or shall any State deprive any person of life, lib-

erty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

"Section 5. The Congress shall have *power to enforce, by appropriate legislation*, the provisions of this article." (Emphasis added.)

Pursuant to Section 5, Congress enacted Section 718 of the Emergency School Aid Act, supra, which by its terms is designed to secure compliance with the Fourteenth Amendment.

■ The state defendants argue that this Congressional authorization of attorney fees to be paid from state treasuries is unconstitutional, because it violates the doctrine of sovereign immunity embodied in the Eleventh Amendment.

■ This argument is without merit. I made my position on this legal issue clear at the hearing on this matter when I issued my preliminary ruling assessing attorney fees against the state. That position was that the Fourteenth Amendment, insofar as there is any conflict, supersedes the Eleventh Amendment. The Fourteenth Amendment was addressed *to the states*. It grew out of the Civil War, and was the product of a radical re-evaluation of the relationship between the states and the federal government. The Fourteenth Amendment was intended to be an expansion of the powers of the federal government, with a concomitant restriction on state sovereignty. *Congress has the obligation to see that citizens are able to enjoy the rights secured to them by the Fourteenth Amendment, and to implement this obligation, it certainly has the power to authorize awards of reasonable attorney fees against the state.* (See, Transcript of Pretrial and Proceedings on Plaintiffs' Request for Attorneys' Fees, pp. 61–64.)

The state defendants vigorously disputed this legal theory in their briefs and oral arguments, but the Supreme Court has just settled the matter by adopting this rationale upon which I have relied throughout. In *Fitzpatrick v. Bitzer*, 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976), the Court unanimously ruled that the Eleventh Amendment was no bar to an award of attorney fees or back pay against a state, when they are authorized by a Congressional statute (in that case, the 1972 Amendments to Title VII of the Civil Rights Act of 1964) enacted pursuant to § 5 of the Fourteenth Amendment.

Writing for seven members of the Court, Justice Rehnquist stated:

"(W)e think that the Eleventh Amendment and the principle of state sovereignty which it embodies, see *Hans v. Louisiana*, 134 U.S. 1, [10 S.Ct. 504, 33 L.Ed. 842] (1890), are necessarily limited by the enforcement provisions of § 5 of the Fourteenth Amendment. In that section Congress is expressly granted authority to enforce 'by appropriate legislation' the substantive provisions of the Fourteenth Amendment, which themselves embody significant limitations on state authority. When Congress acts pursuant to § 5, not only is it exercising legislative authority that is plenary within the terms of the constitutional grant, it is exercising that authority under one section of a constitutional Amendment whose other sections by their own terms embody limitations on state authority. We think that Congress may, in determining what is 'appropriate legislation' for the purpose of enforcing the provisions of the Fourteenth Amendment, provide for private suits *against States or state officials* which are constitutionally impermissible in other contexts. . . ." at 456, 96 S.Ct. at 2671. [Emphasis added.]

The opinion in *Fitzpatrick* relied particularly on *Ex parte Virginia*, 100 U.S. 339, 10 Otto 339, 25 L.Ed. 676 (1880), where the Court observed that the Civil War Amendments "were intended to be, what they really are, limitations of the power of the States and enlargements of the power of Congress." Justice Rehnquist's opinion quotes extensively from *Ex parte Virginia* on the relationship between the language of § 5 and the substantive provisions of the

Fourteenth Amendment, and notes that the case's "contemporaneous recognition of this shift in the federal-state balance has been carried forward by more recent decisions of this Court. See, e.g., *South Carolina v. Katzenbach,* 383 U.S. 301, 308, [86 S.Ct. 803, 808, 15 L.Ed.2d 769] (1966); *Mitchum v. Foster,* 407 U.S. 225, 238–39, [92 S.Ct. 2151, 2160, 32 L.Ed.2d 705] (1972)."

The *Fitzpatrick* decision is hardly surprising in light of Justice Rehnquist's dissent in *Fry v. United States,* 421 U.S. 542, 95 S.Ct. 1792, 44 L.Ed.2d 363 (1975), and the holding of the Court in *Alyeska Pipeline Service v. Wilderness Society,* 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975).

In *Fry,* without specifically referring to the Eleventh Amendment, the majority upheld the constitutionality of provisions of the Emergency Stabilization Act of 1970 [6] which would regulate the amount of salary increases a state could pay its own employees. This legislation, like that at issue in *Maryland v. Wirtz,* 392 U.S. 183, 88 S.Ct. 2017, 20 L.Ed.2d 1020 (1968), was enacted by Congress pursuant to the Commerce Clause, and had a direct effect on state treasuries. Rehnquist, dissenting, stated that he did not believe the Commerce Clause alone was sufficient authority for this regulation of state salaries, but said: "Congress may well be empowered under the legislative authority granted to it by the Fourteenth and Fifteenth Amendments to the Constitution to impose significant restrictions on what would otherwise be state prerogatives. . . ." The majority's holdings in *Fry* and *Wirtz* indicate that in particular circumstances constitutional provisions other than the Civil War Amendments, especially the Commerce Clause, can justify intrusions into state fiscal affairs. But see *National League of Cities v. Usery,* 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976).

In *Alyeska,* the Court settled a question which had divided lower courts and given rise to considerable discussion among commentators on the issue of attorney fee awards in public interest and civil rights litigation.[7] The Court held that federal courts were not free to award attorney fees using the "private attorney general" theory, absent statutory authorization, and stated:

"[Congress has not] extended any roving authority to the Judiciary to allow counsel fees as costs or otherwise whenever the courts might deem them warranted. What Congress has done, however, while fully recognizing and accepting the general rule, is itself to make specific and explicit provisions for the allowance of attorneys' fees under selected statutes granting or protecting various rights.[33]"

Among the numerous statutes listed in footnote 33 are the two involved in this case and in *Fitzpatrick v. Bitzer,* supra.

■ Thus, while the Court in *Alyeska* specifically reserved the Eleventh Amendment question, which it ultimately reached in *Fitzpatrick,*[8] it clearly provided at least an analogue for reconciling conflicts between the Eleventh and Fourteenth Amendments such as that presented here, viz., that the Eleventh Amendment is superseded only by affirmative legislative acts of Congress which limit the prerogatives of the states.

The Supreme Court in *Bradley v. Richmond School Board,* 416 U.S. 696, at 719, 94 S.Ct. 2006, at 2020, 40 L.Ed.2d 476 (1974), quoting from analogous earlier cases, noted that an attorney in a school desegregation case acts "as a 'private attorney general,' vindicating a policy that Congress considered of the highest priority. If successful plaintiffs were routinely forced to bear their own attorneys' fees, few aggrieved

---

**6.** Title II of the Act of August 15, 1970, Pub.L. 91–379, 84 Stat. 799, as amended, note following 12 U.S.C. § 1904 (Supp.). The Act was extended five times before it expired on April 30, 1974.

**7.** See *Alyeska,* supra, n.45, 46.

**8.** Id., n.44.

parties would be in a position to advance the public interest by invoking the injunctive powers of the federal courts . . ."

The attorneys in this case fully implemented the Congressional intent, acting in the highest tradition of the legal profession to vindicate our most important national policy of eliminating all vestiges of slavery. The Eleventh Amendment poses no bar, and plaintiffs are entitled to recover attorney fees pursuant to § 718,[9] since, as the Court noted in *Northcross v. Memphis Board of Education,* 412 U.S. 427, 428, 93 S.Ct. 2201, 2202, 37 L.Ed.2d 48 (1973), "if other requirements of § 718 are satisfied, the successful plaintiff 'should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust.'" There are no such circumstances in this case.

### III. THE PROVISIONS OF § 718 ARE SATISFIED

■ The statutory predicates for an award of attorney fees under § 718[10] are satisfied in this case. The Opinion and Order entered on the merits by this Court on October 4, 1973, was certainly a "final order" within the meaning of the Act. *Bradley v. School Board of Richmond,* 416 U.S. 696, 721–724, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974). The order was against a local educational agency and a state agency for discrimination on the basis of race, in violation of the Fourteenth Amendment as it applies to elementary and secondary education. And, as discussed in greater detail below, the court finds that these proceed-

ings were necessary to bring about compliance.

■ The defendants State Board of Education and Superintendent of Public Instruction take issue with this latter finding, contending that, as to them, these were not proceedings necessary to bring about compliance with the Fourteenth Amendment, as required by the statute. I find this objection to be without merit. The disputed clause of § 718 speaks of proceedings, not parties. The wording and context do not in any way indicate that Congress intended this clause to limit the parties which would come within the statute's sweep. Congress had already provided that the statute would apply whenever a final order was entered against a state or any agency thereof, indicating that state agencies are proper parties under the Act.

A cursory familiarity with this case leaves no question that these proceedings were necessary to desegregate Kalamazoo's schools. Voluntary action had been tried, and in fact, this litigation centered primarily on attempts by the plaintiffs to reinstate a voluntarily adopted desegregation plan which had been rescinded by defendants. The state defendants do not really claim that the proceedings as a whole were not necessary, but rather that only proceedings *against them* were unnecessary. In other words, their argument is that they were not "necessary parties," and as discussed above, the statute as I construe it does not make this distinction between proceedings and parties.

While the Court in *Alyeska* specifically noted the continuing viability of these traditional equitable exceptions to the American rule that each side bears its own attorney fees, it is unnecessary to consider these arguments since it is abundantly clear that the plaintiffs are entitled to fees under the statutory terms of § 718.

I would note in passing that under facts such as those of this case, the class benefit rationale is virtually indistinguishable from the private attorney general theory.

---

**9.** As alternative grounds for entitlement to attorney fees in this case, plaintiffs have (1) relied on the class benefit rationale, claiming that the cost of the litigation should be distributed among those who have benefited, *Sprague v. Ticonic National Bank,* 307 U.S. 161, 59 S.Ct. 777, 83 L.Ed. 1184 (1939); *Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970); *Hall v. Cole,* 412 U.S. 1, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973), and (2) asserted that the defendants were guilty of bad faith and obdurate and obstinate conduct, see *F. D. Rich Co.,* 417 U.S. 116, 129, 94 S.Ct. 2157, 40 L.Ed.2d 703 (1974); *Brewer v. School Board of Norfolk, Va.,* 456 F.2d 943, 949 (C.A. 4, 1972).

**10.** See note 1, supra.

However, even if we assume, arguendo, that the defendants are correct and that Section 718 should be read to require a justification for an award of fees as to each party, the result is the same. This argument is not without merit if what defendants are claiming is that an award of attorney fees or other money judgment may be inappropriate as against a party which is found not to be responsible in any way for the constitutional violations proven. However, this is not the case here. The state's complicity in and responsibility for the unconstitutional segregation proven in this case is well established, and will not be relitigated now under the guise of arguments that proceedings against the state defendants were not necessary to vindicate plaintiffs' rights. I specifically found that the State Board of Education and Superintendent substantially and deliberately contributed to the creation and maintenance of segregation in Kalamazoo and elsewhere. While the injunction issued by this court put most of the immediate remedial burden on the Kalamazoo Board, this did not reduce the ultimate responsibility of the state agencies for the situation which developed. My findings in this respect were set forth in detail in the October 4, 1973 opinion, see 368 F.Supp. at 185–191, and will not be reiterated here. These findings were reviewed and affirmed by the Sixth Circuit Court of Appeals, which stated:

"Given de jure segregation in the Kalamazoo schools, substantially contributed to by local school officials, the State Board of Education and Superintendent may properly be held jointly responsible for segregated conditions in the Kalamazoo schools, in view of their consistent inaction in preventing increased segregation or remedy existing segregation in the Kalamazoo schools and their consistent funding of school construction projects, support for operating fund requests, and other assistance provided to Kalamazoo officials. The failure to take the many available measures against Kalamazoo officials for their segregative actions renders the State Board and Superintendent responsible for de jure segregation in the Kalamazoo schools and subjects them to the reasonable commands of the District Court's desegregation order. . . ." 508 F.2d at 187.

On the basis of the evidence presented at trial, I found the state and local governments to be joint constitutional tortfeasors. Just as one defendant in a normal tort action cannot escape liability by claiming that the plaintiff can get full relief from a joint tortfeasor, the state defendants here cannot avoid their statutory liability by interposing the joint liability of the local defendants. In considering the "necessary and proper" clause of the Constitution, Chief Justice John Marshall said that the word "necessary" must be construed according to "the subject, the context, the intention of the person" using it. *McCulloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 415, 4 L.Ed. 579 (1819). The State Board and Superintendent were "necessary" parties to these proceedings within the meaning of Section 718.

One nonstatutory argument of the state defendants warrants comment. In their supplemental brief, they contend that by making this award, the court is "nullifying" its "pretrial ruling as to the allocation of attorney's fees" between the state and local defendants. This is inaccurate, as is their characterization of the settlement reached between plaintiffs and the Kalamazoo Board of Education. I made no "ruling" on the allocation of fees between defendants. I did discuss an "approximate evaluation," which was specifically prefaced with these qualifying remarks:

". . . I am simply saying it is a present evaluation. And I will tell you this, because if it—if you want to address yourself to it to see whether you can persuade me otherwise, fine. That is exactly what I did all through this case. I state propositions of law so you would know what I was thinking about. I was as honest with you as I could possibly be, and I want you to have an opportunity to challenge what I am thinking. . . ." [Transcript, 7-7-75, at 29.]

Contrary to counsel's argument in the supplemental brief, the agreement reached by plaintiffs with the local defendants did not settle any particular percentage of their claim for attorney fees and expenses. In fact, both attorneys for plaintiffs and the school board agreed on the record that the percentages mentioned were used "merely (as) a settlement guideline." "[I]t is merely a guideline that we used as a rule of thumb to determine our settlement figures. . ." [Id. at 43–44.]

The fact that the payments of the state and local defendants are not apportioned as the state defendants had originally expected is in large part due to the inherent nature of a settlement agreement. In reaching such an agreement both sides compromise, trading the uncertainty of undesirable contingencies for the certainty of money in hand or definite limits on liability. A major factor in this case, for example, was the "element of instant payment." [Id. at 42.] A check for the agreed upon amount was to be in plaintiffs' hands within 24–48 hours after the order was signed, and this would essentially end the matter. An award fixed by the court after an evidentiary hearing could, and the course of this litigation indicates probably would, be appealed. Thus it is reasonable to assume plaintiffs had discounted the amount they sought since they could avoid delays in obtaining the funds and the uncertainties injected by the appellate process.

Further, in determining the fee award the court must weigh the facts of this case in light of judicial precedent. The cases relied upon by the court in Section IV of this opinion may not have been considered by the parties, or their principles incorporated in the settlement, since there was no obligation to do so. Parties who submit their dispute to the jurisdiction of the court, however, must expect the court to apply all the law it finds applicable, even though they might have avoided the consequences of particular decisions had they settled their claims.

## IV. THE FEE AWARD

### A.

The "American rule" that attorneys are normally compensated by their own clients has many statutory and equitable exceptions,[11] and federal courts have broad experience ordering fee awards. While it is fundamental that attorneys, like all others, should be fully and fairly compensated for their labor and skill, it is also evident that the integrity of the judicial system and legal profession requires safeguards against excessive fees. To this end the American Bar Association, in its Code of Professional Responsibility, has delineated eight factors to be considered as guides in determining the reasonableness of fees:

"(1) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly.

(2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer.

(3) The fee customarily charged in the locality for similar legal services.

(4) The amount involved and the results obtained.

(5) The time limitations imposed by the client or by the circumstances.

(6) The nature and length of the professional relationship with the client.

(7) The experience, reputation, and ability of the lawyer or lawyers performing the services.

(8) Whether the fee is fixed or contingent."

Canon 2, DR 2–106.

Most courts, if not relying specifically upon the ABA standards, discuss substantially similar factors, although some have employed variants or added criteria. Of these, the most useful in the present case include the "undesirability of the case," *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 719 (C.A. 5, 1974), and the skill of opposing counsel and character of

---

11. See *Alyeska,* supra, 421 U.S. at 260, n. 33, 95 S.Ct. 1612 (statutory exceptions), and 421 U.S. at 259, 95 S.Ct. 1612 (equitable exceptions).

opposition to the suit, see *Angoff v. Gold-fine,* 270 F.2d 185, 189 (C.A. 1, 1959). Of course, particular factors relevant to certain types of cases may be inapplicable in others. The trial judge must determine what factors are relevant, and what weight they should be given, in each individual case.

Besides listing factors to be weighed, the decided cases are instructive in their analytical approach. They clearly show the inadequacy of determining the amount of a fee award simply by multiplying the number of hours spent by the attorney's billing rate. Such a method may yield an appropriate amount, but it may overcompensate or undercompensate a petitioner. In any event, it is only a first step—albeit an essential one—as it fails to take into account all the factors the judge should weigh in arriving at his or her decision.

"The court cannot properly fix attorneys' fees merely by multiplying the hourly rate for each attorney times the number of hours he worked on the case. . . . [W]e stress, however, the importance of deciding, in each case, the amount to which attorneys would be entitled on the basis of an hourly rate of compensation applied to the hours worked. This figure provides the only reasonably objective basis for valuing an attorney's services."

*Lindy Brothers Builders, Inc. of Phila. v. American R & S San. Corp.,* 487 F.2d 161, 167 (C.A. 3, 1973).

Similarly, the Second Circuit, in *City of Detroit v. Grinnel Corp.,* 495 F.2d 448 (C.A. 2, 1974), stated (at 471):

"We are not under the illusion that a 'just and adequate' fee can necessarily be ascertained by merely multiplying attorney's hours and typical hourly fees. However, we are convinced that this simple mathematical exercise is the only legitimate starting point for analysis. It is only after such a calculation that other, less objective factors, can be introduced into the calculus."

Cf. *TransWorld Airlines, Inc. v. Hughes,* 449 F.2d 51, 79 (C.A. 2, 1971), rev'd on other grounds, 409 U.S. 363, 93 S.Ct. 647, 34 L.Ed.2d 577 (1973).

The problem with adjusting the basic hourly figure to account for these less objective factors is that they are not readily susceptible of valuation. Many reported cases recognize that a fee award should be based on the factors discussed, but few suggest a methodology for doing so. It may be that it is impossible to assign worth in dollars to each factor, or at least to explain why a given sum was ultimately decided upon rather than any higher or lower one—that is often the nature of discretionary decisions. Nonetheless, judges have traditionally made such judgments, and are increasingly called upon to valuate such intangible assets as rights to privacy or aesthetic benefits of the environment. In addition to using the base hourly amount as the "lodestar of the court's fee determination," *Lindy Bros.,* supra, at 168, judges can facilitate reasoned exercises of discretion in this nebulous area by relying upon the factors outlined above and by conducting a hearing when the appropriate amount of the fee award is less than pellucid.

One case in particular cited by plaintiffs is instructive as an example of how to translate a judge's gestalt impression of the effect of these various factors into dollar amounts. In *In re Gypsum,* 386 F.Supp. 959 (N.D.Cal., 1974), a mammoth private antitrust case, applications for attorneys' fees were filed by 28 petitioners. Judge Zirpoli noted that "[the] power of the court to award attorneys' fees and thus reward them as vindicators of public policy is definitely limited by the caution that such awards, though they shall not be niggardly, must be reasonable attorneys' fees, no more and no less." 386 F.Supp. at 962. The judge listed a number of factors similar to those discussed above, and adjusted the base hourly fee by applying a multiple. Depending upon the weight accorded to facts considered relevant in each instance, the size of the multiple varied between one group of counsel and another. The following are examples of how this method was applied in *Gypsum:*

The office of Frederick Furth, identified by the judge as "the chief architect of this entire litigation," served as liaison counsel for all plaintiffs to the ultimate settlement. "Under the circumstances, based upon community standards for attorneys' fees, the court (found) $100 per hour to be reasonable for the services rendered by Mr. Furth and Mr. Boone, $50 per hour for the services rendered by associate counsel, and $15 per hour for the paralegal services." 386 F.Supp. at 967. This resulted in a total for hourly services of $1,329,545. "However, the finding of a reasonable hourly rate for each attorney 'does not end the inquiry,' for the court must also look to the other factors which are of major significance in this litigation.[12] . . . With all these factors in mind, if private enforcement of the antitrust laws is to be expected and encouraged, it is in this court's view eminently reasonable to multiply the hourly value set forth by *a weighed factor of 3*, thereby bringing the total reasonable fee . . . to $3,988,635." Id. [Furth's office had requested $6,764,000, or 10% of the entire settlement fund.]

Applying the same community standards throughout the order, the court found $100 an hour to be reasonable for the services of attorneys Seymour and Tydings, $50 per hour for their associates, and $15 per hour for services of law clerks. This made the total for all hourly services (for 4,146.35 hours) $704,207. "Again, the hourly rate does not tell the full story." Weighing many of the same factors, the court found, "it is reasonable to multiply the hourly value set forth above by a weighted factor of 2.2, thereby bringing the total reasonable fee earned . . . to $1,549,255." Id. at 969.

Although he determined all the same factors applied to each major class, the judge found that, e.g., the degree of risk for attorneys representing particular subclasses varied. Thus he applied a multiple of 1.75 to the $383,157 hourly base figure for the

dealer wholesaler class, finding their risk was less once liability was ascertained in the "dealer cases." Id., 972. Finding a slightly higher risk in the applicator-sub-contractor class, a multiple of 1.85 was used. Id., 974. Certain factors were considered particularly weighty in other instances, including the skill of counsel and substantial contribution to the entire litigation (resulting in a multiple of 1.75 for counsel for the governmental class). Id., 978.

A similar analysis was used by the court in *Kiser v. Miller,* 364 F.Supp. 1311 (D.D.C., 1973), to account for relevant factors in determining the appropriate fee for representation of a class of coal miners seeking recovery of pension and welfare benefits. As in *In re Gypsum,* the court first computed the hourly fee by multiplying number of hours by hourly rate. This base figure was then adjusted to reflect the other relevant factors. In *Kiser,* the court found (1) that the issues were neither novel nor complex (2) that there was relatively little risk involved in light of earlier decisions in the same district court settling the legal question, (3) the incremental benefit that each class member would receive as a result of this suit which they would not have received as class members in the earlier suit was $2400, (4) the suit was undertaken by attorneys as a humanitarian effort, (5) the counsel's relationship to the class was determined by the court, which determined the suit to be a class action, (6) this was not an action for personal injuries or against a corporate giant, but was to recover compensation for denied pension and welfare benefits, and (7) members of the class were among the most impoverished and underprivileged group in the nation. Under these circumstances, the court added an amount equal to 10% of the hourly computation "as a premium for the class representation." This 10% (equivalent in the language of *In re Gypsum* to a multiple of 1.1) is the same figure used by Judge Gessell in *Blankenship v. UMW Welfare and Retirement Fund of*

---

**12.** The court noted the novelty and complexity of the issues and the extreme risk in the contingent nature of this case, as well as lack of government assistance and huge settlement obtained for plaintiffs and savings to consumers.

*1950,* C.A. 2186–69 and 2350–69 (settled January 1973), the earlier coal miner pension case cited in *Kiser* (364 F.Supp. at 1316, n.2).

While the adjustment is called a multiple in one case and a premium in another, it is clear that the labels are irrelevant, and each represents a common approach to valuation of the intangible factors which must be considered as part of any reasonable attorney fee. Use of words like premium or bonus can in fact be misleading, since adjustments may just as well be made to discount the hourly computation as to supplement it. In *Kiser,* e.g., Judge Richey discounted the number of hours claimed to compensate for time spent by the lawyers among themselves, for time spent on the attorneys' fee question, and for discrepancies among the lawyers as to time spent. 364 F.Supp. at 1318. Other cases have likewise adjusted for duplicative efforts and other factors.

### B.

In the present case, plaintiffs' attorneys have asked the court to award them $851,775, less $150,307.50 paid already as a result of a settlement with codefendant Kalamazoo Board of Education. The court feels that while plaintiffs may well deserve that amount, a proper concern for safeguarding the integrity and reputation of the legal profession and judiciary by avoiding excessive fees, and the balancing of factors peculiar to this case, dictate that a more conservative fee be granted. This cautious attitude is an attempt to justly balance the right of every attorney to full and fair compensation with the general welfare of public education. It is not intended to reflect adversely upon plaintiffs' counsel in any way. In light of the foregoing discussion, and for the reasons detailed below, the court finds that the appropriate fee award in this case is $507,067.00. Subtracting the $150,037.50 already paid by their joint tortfeasor, the total liability of the state defendants for attorney fees is $357,029.50.

This court held an evidentiary hearing in July after both parties were given an opportunity to fully brief all aspects of the attorneys' fee issue, including the reasonableness of any fee award. [In addition, defendants' counsel requested and was granted leave to file a supplemental brief on the question of reasonableness.] Petitioners introduced affidavits showing that plaintiffs' attorneys had spent 4,001 hours, attributed to individual counsel as follows: Philip Hummer, 1,454 hours; Richard Enslen, 1,396.5 hours; Louis Lucas, 894 hours; William Weiner, 132 hours; Nathaniel Jones, 115 hours; J. Michael Kemp, 9 hours; James Geary, 0.5 hours. Counsel for defendants has stipulated that these hours were actually spent, as claimed, and that this amount of time was reasonably expended on the litigation. On the basis of affidavits and testimony presented to it, in light of community standards and petitioners' reputation and experience, the court finds that the following hourly billing rates submitted by the various counsel are reasonable; Hummer and Enslen, $75 per hour; Lucas, $60; Weiner and Geary, $35; Jones, $100; and Kemp, $40. Multiplying the hours spent by each lawyer by their respective rates, the court arrives at a base figure of $283,925. This concrete amount is particularly useful as an objective anchor in a case such as this, where the result sought was not money damages, but the vindication of constitutional rights and enforcement of important national policies. Using the hourly computation as a starting point, the court can introduce less objective figures into the calculus, as warranted by the circumstances of this case.

This suit was initiated by attorneys Hummer and Jones. Enslen joined almost immediately, and Lucas was asked to take part after Jones' participation had for the most part ended. Weiner, Kemp and Geary, whose combined time constitutes 3.5% of that spent by plaintiffs' counsel, chiefly did research, and did not appear in any of the conferences or in court proceedings. There were often, but never more than, three plaintiff attorneys present at any given time during the proceedings.

When multiple counsel engage in joint conferences or appear together in courtroom proceedings, the court must consider whether the regular full value of each individual's time should be assessed against the defendant. The court of course recognizes that the parties have stipulated that the time claimed by each attorney was reasonably spent. However, in determining the reasonable value for that time, the court finds it appropriate to adjust for time spent together by applying a discount factor. See *Lindy Bros.*, supra. The court does not wish to denigrate the use of multiple counsel in any way. It is commonplace and useful in major litigation. Defendants in this case, by way of comparison, were represented primarily by three attorneys, Arthur Staton, George McCargar, and Michael Jackson; the extent of assistance obtained from their colleagues is unknown to the court. The court notes from observation of proceedings before it that each lawyer for plaintiffs and defendants contributed effectively and significantly, bringing unique experience to bear or assuming a responsibility for a particular aspect of the case. Nonetheless, this case does not involve enforcement of contractual arrangements between attorneys and clients, but rather an award of attorney fees against a public agency pursuant to statute, and the court feels that these circumstances dictate a cautious exercise of its discretion. With this in mind, the court finds that the base hourly computation for the four attorneys who appeared at various times together should be discounted by 10%.

Many other factors present in this case warrant a positive adjustment of the basic figure. This suit, not unlike other complex federal court litigation, was protracted and thoroughly contested at each stage. About 2,000 exhibits were introduced at trial, and a number of novel issues were debated there. The trial was conducted during a formative period in the law, and counsel did not have the benefit of several subsequent appellate decisions which would have settled some of the major issues of the trial. The highly competent counsel for defendants were aggressive and thoroughgoing,

and employed every possible legal device to assert the interests of their client. The trial court's preliminary ruling was appealed to the Sixth Circuit Court of Appeals, and its final decision to the Court of Appeals and the United States Supreme Court.

Petitioners were successful on appeal, as they had been in this court. Not only did they ultimately secure the results sought on behalf of the plaintiff class, but they also obtained relief at the outset which prevented serious segregative acts from occurring. Plaintiffs' prompt action under the circumstances of this case enabled the court to insure that Kalamazoo's school children would not be denied their rights for over four years while lawyers and judges deliberated, as often happens. The complete vindication of plaintiffs' rights is a credit to the diligence and excellence of their counsel.

Petitioners' skill and competence were amply demonstrated both in the courtroom and by the quality of the briefs and other memoranda submitted. Attorneys Lucas, whose wealth of experience from similar cases was evident and advantageously employed, and Jones, who serves as general counsel for the NAACP, are recognized as among the most capable and knowledgable lawyers in the area of school desegregation law. Attorneys Hummer and Enslen, though not veterans of desegregation cases, per se, are able and experienced lawyers, well respected in their legal community. Their participation is particularly noteworthy, since each willingly devoted well over a thousand hours, at the expense of their substantial private practice, to carry the brunt of this controversial litigation in their own community.

The victims of racial segregation whose constitutional rights these men defended, are American citizens as much as the President or any judge. They had not only done no wrong, but had been wronged. Yet plaintiffs' attorneys, as a "reward" for their efforts to vindicate the rights of these citizens, encountered personal and professional difficulties. Enslen, for example, a Kalamazoo native, told of threats to himself and

his family, and of the disapprobation of many in the community, including friends. Lucas, with experience in more racial discrimination cases, has also suffered more on account of his work—he testified to death threats and harassing, obscene phone calls to his wife, refusal of club memberships, and other abuse. Professionally, each experienced adverse reactions from present or potential clients. Lucas and Enslen, both of whom often try cases to juries, testified that opposing counsel almost invariably point out to prospective jurors during voir dire their participation in the school desegregation suit, often referring to it as *"the busing case."*

The petitioners have also testified that the number of billable hours they worked on other cases was greatly reduced during these proceedings, that they were precluded from undertaking other litigation involving substantial time commitment, and that they encountered difficulties in serving the needs of regular clients because of the enormous amount of time devoted to this case. For Enslen and Hummer at least, representation of the NAACP was discrete, and no long-term financial benefits could be expected from future employment by this client. While Lucas maintains a more substantial and continuous relationship with the organization, his expectation of financial gain from it is problematical.

The federal government is ostensibly charged with securing compliance with laws prohibiting racial discrimination in public education, but it has virtually abandoned the field. The State of Michigan, likewise, has an affirmative duty imposed on it by its constitution, laws and state policies to eliminate school segregation. Cf. *Oliver v. Kalamazoo Board of Education,* supra, 368 F.Supp. at 186–188. It too failed to accept its responsibilities and was in fact found guilty of contributing to the segregative conditions in the Kalamazoo School District.

Thus the young black children who were the most immediate victims of the discrimination were left on their own to challenge the harmful practices of their metropolitan school district and state government. Petitioners' public-spirited representation of these children, and their willingness to undertake a long-term commitment to this unpopular cause, uphold the highest traditions of the legal profession.

None of them entered the case with the expectation of receiving a fee from the plaintiffs, nor were they on retainer, although each expected to be reimbursed for expenses to the extent plaintiffs were able to do so. Their involvement in the suit was motivated by dedication to constitutional principles and declared national policies of the highest order, and compensation for their efforts was only a contingency. The statute authorizing an award of fees in desegregation cases did not become law until nearly a year after plaintiffs filed this suit. Even then, the statute only authorizes awards to *successful* plaintiffs, and petitioners' risk of having labored for four years without compensation is emphasized by the result in cases such as *Higgins v. Grand Rapids Board of Education,* 395 F.Supp. 444 (W.D.Mich., 1973), aff'd, 508 F.2d 779 (C.A. 6, 1974).

It is clear that plaintiffs deserve compensation reflecting these various factors which the ABA guidelines and numerous cases have held to be components of a fee award. Petitioners ask that a multiple be applied to the basic hourly computation, as courts have done in such cases as *In re Gypsum,* supra, or *Kiser,* supra. While testifying about experience in other courts with multiples of six or seven, plaintiffs' counsel have only seriously argued here for application of a multiple of three. A multiple of six or seven in this case, they said, would be excessive, but less than three might be inadequate.[13]

---

13. Petitioners have also suggested that the court might consider as another variable in the fee computation whether the amount paid by the codefendant Kalamazoo Board of Education should be subtracted before or after adjusting for the various factors discussed above.

The court finds the suggestion that the amount of the settlement be subtracted first is untenable, since the amount of the "reasonable attorney's fee" should be initially determined without reference to extraneous or independent factors. Items such as counterclaims or setoffs,

Defendants oppose an adjustment which would result in a fee higher than the basic hourly figure, and seek to distinguish *In re Gypsum* by arguing, inter alia, that "it was strictly private litigation for money damages." While it is true that many of the cases cited by plaintiffs involved private antitrust or other corporate litigation seeking money damages, usually on behalf of a class, these facts do not compel a different approach to the attorneys' fee question. The awards in cases of this type are commonly made pursuant to statutes which, like the Emergency School Aid Act, provide for a "reasonable attorney's fee." See, e.g., the Clayton Act, 15 U.S.C. § 16; The Securities Exchange Act of 1934, 15 U.S.C. §§ 78i(e), 78r(a); and 35 U.S.C. § 2845 (patent infringement). These statutory provisions, like 20 U.S.C. § 1617, were intended to encourage competent private counsel to undertake litigation which would further public policies deemed important by Congress. Cf. *Alyeska,* supra, and *Bradley v. Richmond School Board,* 416 U.S. at 718–719, 94 S.Ct. 2006, citing *Newman v. Piggie Park,* 390 U.S. 400, at 401–02, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968).

The recent Sixth Circuit case, *Singer v. Mahoning County Board of Mental Retardation,* 519 F.2d 748 (C.A. 6, 1975), interprets the provision for a "reasonable attorneys' fee" in 42 U.S.C. § 2000(e) (5) (k) "to require the district court to award a fee that would approximate the customary fee in the community for similar work." The Court of Appeals in *Singer* specifically relies on *Waters v. Wisconsin Steel Works of International Harvester Co.,* 502 F.2d 1309 (C.A. 7, 1974), which stated (at 1322):

"In fashioning a method of analysis to assist in determining the amount of at-

torney fees properly to be awarded in a Title VII action, we cannot subscribe to the view that attorney fees are to be determined solely on the basis of a formula applying 'hours spent times billing rate.'"

Judges awarding fees should be moved by the relevancy and weight of such factors as those listed in DR 2–106, rather than by what statute a suit is brought under, or how particular litigation is labeled. A private antitrust action, e.g., may be exceedingly difficult and protracted, cf. *In re Gypsum,* supra, or it may be merely a "mop-up action" after the Justice Department has secured criminal convictions against the same defendants in a thorough trial. Similarly, an employment discrimination suit may involve complex facts and novel issues affecting a large class, or it may involve simple facts and relatively clear cut legal issues which do not require a week's worth of time, as in *Singer,* supra.

The fee award should be comparably limited in the simpler cases, and likewise should be comparably larger in cases involving many hours, complex issues, greater risk of success, preclusion of other employment, etc. *Ceteris paribus,* there is no reason to treat a patent or antitrust case as inherently different from a discrimination suit.

In cases cited by petitioners, as here, plaintiffs were successful in obtaining results which benefited both the immediate classes of plaintiffs, and the public at large. The fact that the result sought was monetary in one case but not in another is immaterial.[14] Cf. *Hall v. Cole,* 412 U.S. 1, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973); *Mills v. Electric AutoLite Co.,* 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970).

or the right to contribution or indemnity, are not properly components of what is a "reasonable attorney's fee" and can only be taken into consideration after that fee is computed.

**14.** A monetary recovery is only relevant in this context as providing a basis for measuring the attorneys' fee, since counsel often claim a contingency fee, computed as a certain percentage of the total recovery. However, courts have increasingly shown justifiable reluctance to ap-

prove full recovery of fees sought on these terms in class litigation, and instead determine the proper fee based on the factors discussed in this opinion, using the hourly base figure as a more relevant touchstone for reasonableness than the total dollar recovery. The same process is applicable to non-monetary cases, such as this, where the court can ascertain an hourly base figure and the relevant factors which require adjustment of that figure.

The suggested dichotomy between human or constitutional rights, and "private" or corporate rights, is no less specious than the dichotomy between personal liberties and property rights rejected by the Supreme Court in *Lynch v. Household Finance Corporation,* 405 U.S. 538, 92 S.Ct. 1113, 31 L.Ed.2d 424 (1972). As Justice Stewart, speaking for the Court, noted in *Lynch:*

> "Property does not have rights. People have rights. . . . In fact, a fundamental interdependence exists between the personal right to liberty and the personal right in property. Neither could have meaning without the other." 405 U.S. at 552, 92 S.Ct. at 1122.

That a constitutional tort is no less serious than any other wrong is an understatement which ought not be necessary, but apparently is. There is no difference, in terms of the public interest or Congressional policies, between adequately compensating lawyers who insure on behalf of stockholders or businessmen that corporations obey the laws with respect to tender offers or restraints on trade, and lawyers who insure that state agencies obey the laws forbidding race discrimination and guaranteeing equal protection. Congress has declared that attorneys in either case should receive "a reasonable attorneys' fee," and the courts in carrying out this mandate should not discriminate against those who vindicate important Constitutional rights without seeking money damages.

The ESAA specifically authorizes fee awards against the state, and the court has found defendants' objections to the statutory provisions to be completely without merit. (See parts I-III, supra). Nonetheless, the court is aware that this fee award will draw upon public funds at a time when financial resources are especially dear. While this does not diminish petitioners' right to recover just compensation, it is a factor which the court feels may properly be considered in determining what amount

is reasonable. To ignore the various factors discussed above would be inequitable, but under the circumstances the court finds that the basic hourly figure for the four attorneys primarily involved, discounted as directed above, should be increased by a factor of only 2.00. The factors discussed do not similarly apply to the other three attorneys who did work for plaintiffs, and the court finds that they are adequately compensated by the basic hourly amount.

The fees earned by each individual attorney in this case, therefore, computed and adjusted as indicated above, are as follows:

| | |
|---|---|
| Hummer | $196,290.00 |
| Enslen | 188,527.50 |
| Lucas | 96,552.00 |
| Jones | 20,700.00 |
| Weiner | 4,620.00 |
| Kemp | 360.00 |
| Geary | 17.50 |

As above noted, the $150,037.50 already paid by the local defendants is to be subtracted from the sum of these fees. Plaintiffs are directed to inform the state defendants promptly how the remaining monies are to be distributed in light of this deduction, and in light of any other arrangements among plaintiffs' attorneys.

### EXPENSES

At the close of the hearing at which I tentatively fixed the amount of the fee award, I ruled that the state would be liable for one-fourth of the expenses incurred by plaintiffs,[15] plus all compensation for the services of researcher Karen Miller.

This latter item was the subject of two stipulations at the hearing. Since Ms. Miller was not available, her time was estimated by plaintiffs' counsel, based on an affidavit of Duane Roberts, at a minimum of 1500 hours. Attorney Lucas asked defendants' counsel McCargar to stipulate that Ms. Miller had worked on this litigation 1500 hours. McCargar so stipulated, without agreeing to the reasonableness of

---

**15.** As part of the settlement agreement reached between plaintiffs and the Kalamazoo Board of Education, KBE agreed to pay 100 per cent of the costs, with the understanding that they

would be reimbursed to the extent that such costs were recovered from the state defendants. This agreement did not encompass the fee for services of Ms. Miller.

the time spent, its value, or plaintiffs' entitlement to compensation from the state. Plaintiff requested that the court fix the reasonable value of these research services at $20–$25 per hour, citing several cases. However, after computing the compensation which would result from applying even the lower rate to the hours worked—$30,000—plaintiffs' counsel (Enslen) conceded that this sum would be high, and offered to stipulate that $15,000 would be a reasonable figure, based on an hourly rate of $10. I noted that the higher hourly rate, in general, would be a reasonable one but that under the circumstances, I would, sua sponte, fix the amount to be assessed against defendants for her services at $15,000. Subsequently, Ms. Miller returned to the country and submitted an affidavit stating that her actual time was in excess of 2000 hours. However, in view of counsel's stipulation as to hours and my ruling noted above, as well as a belief that $15,000 is not unreasonable, I will not increase the fee for Ms. Miller's services from the figure decided upon at the hearing.

As to the other expenses, there seem to be a few items about which plaintiffs and the Kalamazoo Board of Education still disagree. My ruling that the state defendants are to pay one-fourth of these expenses stands, but it is not possible to valuate them at this time. Therefore, I am ordering the attorneys for the plaintiffs and Kalamazoo Board of Education to meet and confer within 21 days regarding these expenses. They are to negotiate in good faith to resolve all areas of dispute possible, and should submit any questions as to which there is still honest disagreement to the court within 30 days from the date of this order. The state's liability for expenses will be based on the result of these proceedings, since it is determined as a fraction of the local board's liability.